COMMONWEALTH *vs.* JOSE ALICEA.

No. 01-P-740.

Worcester. April 8, 2002. - July 25, 2002.

Present: PORADA, GILLERMAN, & KAFKER, JJ.

*Arrest. Practice, Criminal,* Motion to suppress, Admissions and confessions. *Evidence,* Admissions and confessions. *Telephone.*

Where police officers intentionally violated a criminal defendant's right, under G. L. c. 276, § 33A, to use a telephone "forthwith" upon being placed in custody, the motion judge properly suppressed not only the defendant's incriminatory statement made shortly after the intentional violation of his rights, but also the defendant's later incriminatory statement, which was derived directly from the previous statement and therefore was "fruit of the poisonous tree." [509-512]

INDICTMENTS found and returned in the Superior Court Department on July 16, 1999.

Pretrial motions to suppress evidence were heard by *John S. McCann,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *John M. Greaney,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

*Anne S. Kennedy,* Assistant District Attorney, for the Commonwealth.

*Brian J. Buckley* for the defendant.

GILLERMAN, J. The Commonwealth has appealed from an interlocutory order of the Superior Court[1] suppressing two written, signed statements of the defendant regarding his involvement in the murder of Jorge Perez-Caraballo on May 25, 1999. See G. L. c. 278, § 28E. At issue are the consequences of the

[1]A single justice of the Supreme Judicial Court allowed the Commonwealth's application for an interlocutory appeal on April 4, 2001.

failure of the police to conform to the requirements of G. L. c. 276, § 33A, which we set out in the margin,[2] combined with a false and deceptive statement by the police that was coupled with a promise of leniency in return for an inculpatory statement. We affirm the judge's order.

We summarize the material facts found by the judge following the suppression hearing, and we supplement those facts with uncontroverted testimony. See *Commonwealth* v. *Torres*, 433 Mass. 669, 670 (2001).[3]

Responding to an emergency telephone call at 611 Millbury Street, Worcester, on May 25, 1999, at about 11:00 P.M., the police entered a second-floor apartment at that address and found Perez-Caraballo with his hands and feet duct taped and bleeding from wounds on his head. He was taken to St. Vincent's Hospital where he subsequently died of a gunshot wound to the head and a substantial head trauma. The police found a store receipt for duct tape in the apartment.

The defendant occupied the first-floor apartment at 611 Millbury Street with Amari Gomez, his nineteen year old pregnant wife,[4] and their two children. The police, calling on neighbors for information that same night, sought out the defendant, but he was not at home. The police requested that Gomez ask the defendant to come to the police station for an interview. Two days later, the defendant complied, and accepted a ride to the police station from Detective Gingerelli in an unmarked, police cruiser, arriving at the station at approximately 10:30 A.M. Go-

---

[2]General Laws c. 276, § 33A, provides that: "The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station, or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter."

[3]There is no involvement in this case of Federal or State constitutional rights which otherwise would require us to make our own independent determination of the correctness of the judge's constitutional rulings on the facts found. See *Commonwealth* v. *Perry*, 432 Mass. 214, 234 (2000).

[4]Although the record is unclear as to whether the defendant and Gomez are married, the judge referred to Gomez as the defendant's wife in his findings.

mez followed the defendant to the station with their children. Shortly thereafter, the police advised Gomez to return home with her children, and she did so. We outline the succeeding events, following the time-line set out by the judge in his findings.

*10:30 A.M. to 11:30 A.M.* Gingerelli questioned the defendant in an interview room at the police station. The defendant gave an exculpatory statement that accounted for his whereabouts during the evening in question.

During this interview, Gingerelli stepped out of the interview room and joined other detectives who were watching a store surveillance video that recorded events during the night of the shooting. The video depicted two males purchasing duct tape. Gingerelli identified the defendant as one of the figures on the tape. At this point, Gingerelli considered the defendant a suspect in the murder.

*11:30 A.M. to 2:30 P.M.* Gingerelli, along with Detective Looney, returned to the interview room and, before completing the defendant's first statement, read the defendant his Miranda rights. The defendant acknowledged that he could read and understand English, and that he understood his Miranda rights and wished to waive those rights. The defendant then signed the Miranda card, as did Gingerelli and Looney. After the first statement was completed, the detectives told the defendant that he was on the store videotape and was now a suspect in the murder. The detectives asked the defendant to review and sign his previous two-page alibi statement to Gingerelli, and he did so.

Detectives Gingerelli and Looney then interrogated the defendant for almost three hours, until approximately 2:30 P.M. The defendant viewed the store video, but he denied being the person shown on the tape. Up to this point, the defendant had made no incriminating statements.

Meanwhile, Gomez had returned to the police station at approximately 2:00 P.M. Lieutenant Rutherford showed her the store videotape and falsely and deceptively told her that the

defendant had admitted to being involved in the crime.[5] Ruther-ford then told her that if she went into the hearing room and convinced the defendant to cooperate, he would be given a sentence of three to five years for his involvement in the shooting.[6]

*3:00 p.m. to 5:30 p.m.* Shortly after 3:00 p.m., Detectives Gin-gerelli and Looney resumed their interrogation of the defendant. Gomez came into the interview room and remained throughout the interview. Gomez was upset, and she appeared to be sick. The defendant was crying as he talked to his wife about their family, her pregnancy, and the baby. Gomez told the defendant, in Spanish, about her conversation with the police, including Rutherford's statement that if the defendant cooperated with the police, they promised to give him "less time."

The defendant waived his Miranda rights and then gave a second statement, incriminating himself for the first time. Simply put, he acknowledged acting as the lookout for the planned robbery of the victim. After the second statement was reduced to writing, the police asked the defendant to read and sign it; he did as requested. Gomez then left the station. The time was now about 5:30 p.m.; this interview had lasted about two and one-half hours.

*7:15 p.m. to 7:20 p.m.* After the defendant signed his incriminating statement, he was formally booked. The defendant appeared to understand all that was going on. During the book-ing process, and for the first time, he was asked, twice, by the booking officer if he wished to use the telephone. He was not advised of his right to do so under G. L. c. 276, § 33A. The defendant replied twice that he wanted to make a telephone call, and after his second affirmative response, the defendant made the call, which was recorded on videotape.[7] While on the telephone, the defendant spoke only in Spanish to an unidenti-

---

[5]Because the suppression of the defendant's ensuing incriminating state-ment is not challenged by the Commonwealth, we need not comment on the deceptive statement by the police. See, however, *Commonwealth* v. *Groome*, 435 Mass. 201, 216 n.21 ("[p]olice deception, can, if sufficiently egregious, eviscerate the voluntariness of any subsequent statement").

[6]Lieutenant Rutherford was deceased at the time of the hearing.

[7]During the motion hearing, a court interpreter translated the defendant's telephone call.

fied person. He instructed the other party to give him some money for the canteen, to find out if bail had been set, to find a good lawyer, and to tell Gomez and his children that he loved them. It was now 7:20 p.m.

*10:00 p.m. to 12:15 a.m.* Shortly after 10:00 p.m., Sergeant Towner instructed Detective Coakley to obtain a third statement from the defendant.[8] Before Coakley began to take the defendant's statement, Towner read from a multiple rights form, which included, for the first time, information concerning the defendant's right to a telephone call under G. L. c. 276, § 33A. After Towner read this form to the defendant, the defendant read the form himself and signed it. It was now 10:20 p.m., three hours after booking and approximately eleven hours after the defendant had first been considered a suspect in the murder.

Coakley, with Detective Quitadamo present, then conducted the interview, during which the defendant gave a third statement, further incriminating himself by acknowledging that he had been in the apartment when the shooting had occurred. The defendant was given a printed copy of his statement. He read it, said he understood it, and signed it. He also signed a consent form to search his motor vehicle. It was now 12:15 a.m. The defendant had been in the police station for nearly 14 hours. There was no indication whether he had received any nourishment.

*Discussion.* The defendant arrived at the police station at about 10:30 a.m. At approximately 11:30 a.m., after being identified on the store video tape, he became a suspect in Perez-Caraballo's murder. From that point forward, the provisions of G. L. c. 276, § 33A, attached. The defendant was not free to leave the station. He was in the custody of the police, and he was then entitled to be told of his right to use a telephone "forthwith," and to be given the opportunity to do so within one hour.[9]

During the hour after the police told the defendant that he

---

[8]Another individual, Reinaldo Colon, had been arrested that evening and had given a statement about the homicide. Various inconsistencies between Colon's statement and the defendant's statement led to the decision to interview the defendant a third time.

[9]The Commonwealth makes no argument to the contrary.

was a suspect in the crime, no one advised him of his right to make a telephone call in order to communicate with his family or friends, to arrange bail, or to engage an attorney. It was not until 7:15 P.M., *after* the defendant had given his incriminating statement for the first time, that he was allowed to use a telephone, and it was not until 10:20 P.M. that he was specifically advised of his statutory right to the use of a telephone.

The judge ruled that the statutory violation was intentional. This ruling was based on the judge's findings that the five detectives involved in questioning the defendant from 11:30 A.M. on May 27 to 12:30 A.M. on May 28 were veterans, with more than 70 years' aggregate experience. Further, the printed form that the police gave to the defendant at 10:20 P.M. had the suspect's § 33A rights printed on it.

On the basis of these findings, the judge concluded that "the detectives knew of the statutory right, and refused, failed or neglected to so inform [the defendant] earlier, at 11:30 A.M., of such right. . . . [S]uch wanton or reckless disregard of [the defendant's] rights rises to the level of intentional conduct by all of the detectives."

The judge ruled that "[w]here the action of the detectives is intentional[,] suppression is required," citing *Commonwealth* v. *Alicea*,[10] 428 Mass. 711, 716 (1999). The judge ordered the suppression of the defendant's second statement.

Neither in its brief nor at oral argument did the Commonwealth challenge the correctness of the judge's suppression of the defendant's second statement following the visit from defendant's wife. Thus, the Commonwealth concedes that the violation of G. L. c. 276, § 33A, was intentional, requiring suppression of the defendant's second statement. See *Commonwealth* v. *Jones*, 362 Mass. 497, 502-503 (1972) ("[w]e are of the opinion that whenever a defendant is *intentionally* deprived of his statutory right to seek assistance of friends or counsel by telephone, police should be held strictly to account

---

[10]The similarity in the names is a coincidence.

for their conduct in relation to the defendant while he is held incommunicado") (emphasis in original).[11]

We turn, then, to the third statement made by the defendant which the judge, citing *Wong Sun* v. *United States*, 371 U.S. 471 (1963), summarily ordered to be suppressed as well. The Commonwealth argues that the defendant's third statement should not have been suppressed under *Wong Sun* as the "fruit of the poisonous tree," because there was sufficient attenuation between the second and third statements.

We disagree. Recently, in *Commonwealth* v. *Marquez*, 434 Mass. 370, 378-379 (2001), a case involving the suppression of a "later statement [which] was itself the product of . . . [earlier] statements made at the time of the arrest," the court wrote that the later statement "could still be suppressed under a 'fruit of the poisonous tree' or 'cat out of the bag' analysis." The court continued: there must be, however, "a connection" between the unlawfully obtained statements and the defendant's later statement. The Commonwealth bears the burden of proving that the connection between the police misconduct and the challenged statement "has become so attenuated as to dissipate the

---

[11]The Commonwealth makes no argument that the appearance of the defendant's wife at the police station before the defendant gave an incriminating statement terminated the isolation of the defendant in the station house — the condition for which the statute is designed to provide relief. However, *after* the defendant gave the police an incriminating statement, and after the defendant was finally told of his right to make a telephone call, he called a friend and, inter alia, asked him to find the defendant a good lawyer.

One can only speculate whether, had the plaintiff been allowed to make a call within an hour of being told he was a suspect at about 11:30 A.M., the defendant's friend might have secured a lawyer who, if he had arrived promptly at the police station, might have advised the defendant to say nothing. That uncertainty cannot favor the police, however, lest § 33A be undone completely; the commands of § 33A are unequivocal. In short, had the Commonwealth made such an argument, it would not have succeeded. We also emphasize that Lieutenant Rutherford's promise to Gomez of a reduced sentence in return for the cooperation of the defendant — which was promptly conveyed by her to the defendant — was prohibited conduct by the police, the effect of which was to nullify the second statement. See *Commonwealth* v. *Brandwein*, 435 Mass. 623, 634 (2002), quoting from *Commonwealth* v. *Meehan*, 377 Mass. 552, 564 (1979) ("An officer may suggest broadly that it would be 'better' for a suspect to tell the truth," as long as there is no 'assurance, express or implied, that it will aid the defense *or result in a lesser sentence*" [emphasis added]).

taint." *Commonwealth* v. *Fredette,* 396 Mass. 455, 459 (1985), citing *Nardone* v. *United States,* 308 U.S. 338, 341 (1939).

The Commonwealth has not carried that burden. We recapitulate the circumstances. The defendant's first statement — an alibi — was totally discredited by the defendant's second statement in which he implicated himself in the murder. The defendant gave the second statement in response to the unlawful promise by the police that if he cooperated he would serve "less time," and before he was finally notified of his right to make a telephone call. The police needed the third statement to verify certain details of the crime the defendant had described in his second statement. See note 8, *supra.*

The need to respond to the demand of the police for a third statement required the defendant to consider several choices: he could refuse to give a third statement in spite of the fact that the "cat was out of the bag," which meant that by refusing he would risk the certain loss of the benefit of the promise of "less time" because he was not "cooperating"; he could return to his original alibi even though discredited; or he could continue his cooperation with the police, give the entire story in detail, and receive the benefit (he believed) of the promised reduced sentence. Compared to the alternatives, the last choice was clearly the most sensible, and he chose that course.[12] That decision, and the resulting third statement, were the direct and immediate products of all the circumstances surrounding the second statement. That is enough to establish, to our satisfaction, that the third statement was derived directly from the second statement, thereby creating a connection sufficient to justify the suppression of the third statement under *Commonwealth* v. *Marquez, supra.*[13]

---

[12]The third statement, which is in the record before us, includes the following exchange:

"Q. Is there now something additional you would like to add to your previous statements?

"A. The first one I lied cause I was scared. The second one I lied cause I didn't want to hurt my family. The second one was mostly true. *I just want to tell the truth about everything*" (emphasis added).

[13]We reject the Commonwealth's argument that *Wong Sun's* principles are not available in this case.

The order suppressing the second and third statements is affirmed.

*So ordered.*