COMMONWEALTH vs. JEARLEE S. PILEEKI.

No. 02-P-527.

Barnstable. December 1, 2003. - November 29, 2004.

Present: BECK, BROWN, & CYPHER, JJ.

*Evidence*, Voluntariness of statement, Admissions and confessions. *Practice, Criminal*, Voluntariness of statement, Instructions to jury, Duplicative convictions.

At the trial of indictments for burning a dwelling and involuntary manslaughter, a Superior Court judge properly admitted as voluntary a statement the defendant made at the police station four hours after having made an involuntary statement at the hospital (where she had been brought due to a suicidal incident), where the intoxication and emotional distress that had affected the first statement had significantly receded, thus causing a sufficient break in the stream of coercive circumstances, and where the second statement was not brought on by a sense of futility [508-510]; moreover, there was no prejudicial error in the judge's refusal to redact portions of the second statement referring to the first, given the judge's instruction to the jury that they could not speculate about or concern themselves with references to previous questioning [510].

This court concluded that there was no violation of G. L. c. 276, § 33A, requiring police to give arrested persons notice of their right to use the telephone, where a criminal defendant who was questioned at a police station had not been formally arrested at the time she rendered her statement. [510-511]

Although the judge at the trial of an indictment for involuntary manslaughter should not have made reference to the "battery causing death" theory of manslaughter in his instructions to the jury, the error was not prejudicial, where the instructions as a whole focused the jury's attention on the correct theory of the case, and where the indictment read aloud to the jury laid out only the wanton and reckless theory, which was the basis for the prosecution's case. [511-512]

This court concluded that a criminal defendant's convictions of involuntary manslaughter and burning a dwelling were not duplicative because the elements of those crimes were clearly different and addressed different legislative goals. [512-514] BROWN, J., concurring.

INDICTMENTS found and returned in the Superior Court Department on June 8, 1999.

A pretrial motion to suppress evidence was heard by *Gerald F. O'Neill, Jr.* J., and the cases were tried before *Richard F. Connon*, J.

*Andrew R. Silverman*, Committee for Public Counsel Services, for the defendant.

*Julia K. Holler*, Assistant District Attorney, for the Commonwealth.

BECK, J. The defendant, Jearlee Pileeki, was found guilty of burning a dwelling, G. L. c. 266, § 1, and involuntary manslaughter, G. L. c. 265, § 13. She was sentenced to MCI, Cedar Junction, for a term of not more than six years and not less than three years and nine months on the manslaughter conviction, and to five years' probation, with special conditions, on the arson conviction, to be served from and after the sentence on the manslaughter conviction. On appeal, she claims the following errors: (1) the second of four statements she made to the police should have been suppressed (as were the other three); (2) even if the second statement was admissible, references to a previous statement she made at the hospital should have been redacted; (3) it was prejudicial error for the judge to instruct the jury on the "battery causing death" theory of manslaughter; (4) the police failed to inform her of her right to make a telephone call pursuant to G. L. c. 276, § 33A; and (5) the convictions of burning a dwelling and manslaughter are duplicative.

1. *Factual and procedural background.* On the evening of May 19, 1999, there was a fire in a vacant house in Hyannis. After the fire was extinguished, the body of a homeless man, Joseph Maddox, was discovered inside. An autopsy revealed he had died of smoke inhalation. The fire appeared to have originated in an overstuffed chair on the first floor of the house. Police investigation revealed that the victim was known to spend time at the house with the defendant.

Two days later, at about 11:00 A.M. on May 21, the police received an emergency telephone call regarding a suicidal woman who had consumed a pint and a half of vodka and two Klonopin tablets, had superficial cuts on her wrists, and indicated that she had tried to shoot herself. That woman was the defendant. An ambulance transported the defendant to the

hospital, where a blood serum test revealed that she had an ethyl alcohol level of .378, the equivalent of a blood alcohol level of .33.

The defendant made four statements to various police officers that day. The first was shortly after 12:30 P.M., at Cape Cod Hospital, without benefit of Miranda warnings. The second took place between approximately 2:45 and 3:15 P.M. at the Barnstable police station after the defendant was given Miranda warnings and signed a waiver of her Miranda rights. This second statement was tape recorded. See *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 445-448 (2004). The third statement, also made at the police station, lasted only seven to eight minutes and was not recorded. Finally, the defendant made a fourth statement, also at the police station, which lasted about ten minutes and which was also recorded. The defendant was again given the appropriate warnings but was not told that a lawyer was waiting to talk to her.

The defendant moved to suppress all four statements. A Superior Court judge allowed the motion as to the first, third, and fourth statements. He denied that part of the motion that sought to suppress the second statement.

As to the first statement, made at Cape Cod Hospital, the motion judge ruled that the defendant "was not in a condition to exercise the judgment necessary to support a finding that her statement was a product of a rational intellect as well as a free will" because of her intoxication and emotional instability. On the other hand, the motion judge found that "[a] review of [the] recording of the second statement reveal[ed] an entirely different person than is heard on the earlier 911 call. The defendant sound[ed] calm, rational, somewhat intelligent and [gave] responses that [were] appropriate to the questions propounded." Observing that "the defendant was a functioning alcoholic given to consuming substantial amounts of alcohol on a frequent basis," the judge concluded that the defendant's second statement was "voluntary and the product of a rational intellect and a free will."

In that statement, the defendant said that she knew the victim, and had been with him two days before at the house where the fire had occurred. The victim tried to have sex with her in an

upstairs bedroom. She refused, and the victim left. The defendant went downstairs and sat in an overstuffed chair. She lit a cigarette and attempted to light other items (for example, discarded clothing) that were nearby. She knocked the lighted tip of the cigarette onto the arm of the chair, blew on it, and then left the house. The defendant told the police officers that when she left, she smelled smoke but had not seen a flame. She stated also that she felt that the house was evil and that it would be a good thing if it "cooked." The defendant appeared to be unaware that the house had burned or that the victim had died.

2. *Issues on appeal.* a. *Admissibility of defendant's second statement.* The defendant raises two related claims regarding her second statement to the police, which was made at the police station and which was the first of her statements to be recorded. First, she claims the second statement was involuntary, because it was "tainted" by the involuntary statement she made at the hospital. See *Commonwealth* v. *Prater,* 420 Mass. 569, 579-580 (1995). Second, she claims that even if the narrative itself was admissible, the parts of the statement that referred to the earlier hospital statement should have been redacted. She contends that the failure to do so was reversible error. We address each claim in turn.

In evaluating the admissibility of a statement given after a previous involuntary statement, the court must assess the totality of the circumstances to determine whether the statement was voluntary. *Commonwealth* v. *Mahnke,* 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976), and cases cited. "The burden of proof is on the government to show such voluntariness by a preponderance of the evidence." *Id.* at 682, citing *Jackson* v. *Denno,* 378 U.S. 368, 377-378 (1964).

Two lines of analysis guide our assessment of the evidence of voluntariness. First, "the court must look for a 'break in the stream of events,' [in] the coercive circumstances which extracted earlier statements." *Commonwealth* v. *Mahnke, supra* at 682, quoting from *Clewis* v. *Texas,* 386 U.S. 707, 710 (1967). The break must be "sufficient to insulate the [subsequent] statement from the effect of all that went before." *Ibid.*

The second line of analysis looks more specifically to the ef-

fect of the previous confession on the defendant's will. Did it create a sense of futility, a belief that "the cat was already out of the bag?" *Darwin* v. *Connecticut*, 391 U.S. 346, 351 (1968) (Harlan, J., concurring in part and dissenting in part). "Fear, continuation of coercive effects, and a sense of futility of attempting to 'get the cat back in the bag' are the objects of the analysis." *Commonwealth* v. *Prater*, 420 Mass. at 584, quoting from *Commonwealth* v. *Mahnke*, 368 Mass. at 688. "[W]hether one or both lines of analysis is required before a confession is admitted turns on the facts of the case." *Commonwealth* v. *Prater*, *supra* at 580 n.10.

Under either line of analysis, the statement here was admissible. As to whether there was a break in the stream of events, the defendant forcefully argues there was no break because she went from being detained by hospital personnel at the hospital to being questioned by the police at the police station, with no interruption in her custodial status. However, custodial status is not the issue here. Rather, we focus on "the coercive circumstances which extracted [the] earlier statements." *Commonwealth* v. *Mahnke*, 368 Mass. at 682. The coercive circumstances here were not the defendant's being kept at the hospital (which the motion judge explicitly found did not amount to custodial interrogation), but rather the defendant's intoxication and emotional distress. The judge found, and upon review of the tape recordings of the interview, we agree, that the intoxication and emotional distress had significantly receded by the time the defendant gave the first of her three statements at the police station almost four hours later. As in *Commonwealth* v. *Prater*, 420 Mass. at 582, "sufficient time had elapsed for the effects of alcohol to have worn off." Similarly, as in *Prater*, the defendant was calm and even joked with the police during the interview. *Ibid.* We agree with the judge that there was a sufficient break in the stream of coercive circumstances.

Nor does the evidence suggest that the defendant's second statement was motivated by a feeling that she had let the cat out of the bag. At the time of the second police interview, the defendant appeared to be unaware that the house had burned or that any harm had come to the victim. Indeed, it appears that the defendant thought the police were focused more on her

suicide attempt than on her having started a fire. When police asked the defendant if she felt she had done "anything wrong," she replied, "The thing I did wrong was try to load that gun. That's what I did wrong." When an officer stated he was referring to the house, the defendant explained, "No, because I didn't cook the place, and the fire went out."

Reviewed as a whole, the interview reveals a defendant whose decision to talk to the police was not based on a sense of futility brought on by having made previous statements. Thus, as to the second statement, the Commonwealth carried its burden of showing that the statement was not coerced but voluntary.

b. *Redaction.* The defendant next argues that even if the second statement was admissible, it should have been redacted to eliminate any allusion to the prior statement the defendant made at the hospital, which had been suppressed. The defendant claims she was harmed because "the jury, understanding that the defendant had said the same thing earlier at the hospital, would have been far more likely to believe that the inculpatory statements made at the police station were truthful."

Upon review of the statements as set out in the transcript and on the tape recording, we conclude that the defendant was not prejudiced. (There is no question that she objected.) Many of the remarks complained of are brief phrases repeating earlier comments. Moreover, the judge's decision to instruct the jury that they could not speculate about or concern themselves with references to previous questioning was a reasonable and effective alternative to the defendant's request that the statements be redacted. We may presume that the jury followed the judge's instructions. See *Commonwealth* v. *Martinez,* 437 Mass. 84, 90 (2002). There was no prejudicial error.

c. *Failure to inform of telephone rights.* Relying on *Commonwealth* v. *Alicea,* 55 Mass. App. Ct. 505, 509 (2002), the defendant claims her statement should have been suppressed because the police failed to comply with the statute requiring that an "arrested person" be given notice of her right to use the telephone. G. L. c. 276, § 33A.

There is no dispute that the defendant was not under arrest at the time of her second statement. Nonetheless, the defendant argues she was in "custody," and therefore her statement must

be suppressed. While this proposition did find some support in *Commonwealth* v. *Alicea, supra,* recent Supreme Judicial Court cases have made clear that the provisions of G. L. c. 276, § 33A, do not attach until a suspect is "formally arrested." See *Commonwealth* v. *Novo,* 442 Mass. 262, 272 (2004). See also *Commonwealth* v. *Caputo,* 439 Mass. 153, 162 n.11 (2003) ("The police are not required to inform the defendant that he is entitled to a telephone call until the defendant is arrested"). Compare *Commonwealth* v. *Scoggins,* 439 Mass. 571, 578 (2003) ("unfavorable evidence derived from an intentional denial of a suspect's statutory right to a *postarrest* telephone call must be suppressed" [emphasis supplied]). The court recently rejected an argument that the statute should be interpreted broadly to extend to persons in custody as well as under arrest. See *Commonwealth* v. *Rivera,* 441 Mass. 358, 374-375 (2004). See also *Commonwealth* v. *Dagley,* 442 Mass. 713, 719-720 (2004). There was no violation of G. L. c. 276, § 33A.

d. *Jury instruction.* The defendant next claims that the judge committed reversible error by mentioning the "battery causing death" theory of involuntary manslaughter. She contends there was no evidence to support that theory. We agree that the reference to the "battery causing death" theory should not have been made. The defendant having objected, we consider whether the reference created prejudicial error. See *Commonwealth* v. *Alphas,* 430 Mass. 8, 13 n.7 (1999), and cases cited.

In the context of an error relating to jury instructions, "whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction." *Commonwealth* v. *Koonce,* 418 Mass. 367, 372 (1994), quoting from *Commonwealth* v. *Shelley,* 411 Mass. 692, 695 (1992). In conducting such an inquiry, we examine the charge in its entirety. See *Commonwealth* v. *Thomas,* 439 Mass. 362, 366 (2003).

Our examination of the instruction as a whole persuades us that the error was not of consequence. The reference to battery was a single sentence in a twenty-six page charge. The judge did not elaborate or expound upon it. Nor did he define the term "battery." Rather, after the single sentence, he proceeded

to explain thoroughly and carefully the elements of the wanton and reckless conduct theory, beginning with an unlawful killing, followed by three and one-half paragraphs defining wanton and reckless conduct. This recitation would have focused the jury's attention on the correct theory of the case.

Our conclusion is bolstered by the fact that the indictment (which was read aloud to the jury) laid out only the wanton and reckless theory. This theory was also the basis for the prosecution's case. No battery theory was presented to the jury. *Commonwealth* v. *Fickett*, 403 Mass. 194, 197 (1988), and *Commonwealth* v. *Flynn*, 420 Mass. 810, 818 (1995), cited by the defense, are therefore not on point. The error was not prejudicial.

e. *Duplicative convictions.* Finally, for the first time on appeal, the defendant claims that the two offenses of which she was convicted were "so closely related in fact as to constitute in substance but a single crime," *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 662-663 (1979). She asserts that her conviction of burning a dwelling must therefore be vacated as duplicative. See *Commonwealth* v. *Valliere*, 437 Mass. 366, 371-372 (2002) ("appropriate remedy for duplicative convictions, so as to prevent multiple punishments, is to vacate both the conviction and sentence on the lesser included offense, and to affirm on the more serious offense").

"In determining whether, on the basis of a single act, a defendant may be prosecuted and punished for two statutory or common law crimes, the long-prevailing test in this Commonwealth is whether each crime requires proof of an additional fact that the other does not." *Commonwealth* v. *Jones*, 382 Mass. 387, 393 (1981), citing *Morey* v. *Commonwealth*, 108 Mass. 433, 434 (1871). If so, "an acquittal or conviction under either . . . does not exempt the defendant from prosecution and punishment under the other." *Morey* v. *Commonwealth, supra.*

Under the *Morey* rule, there is little question that the defendant in this case was properly prosecuted for both offenses. The elements of burning a dwelling are clearly different from those required to prove involuntary manslaughter. Arson of a dwelling requires proof of a malicious intent to set fire to or burn a dwelling or a building habitable as a dwelling. See G. L.

c. 266, § 1; *Commonwealth* v. *Anolik*, 27 Mass. App. Ct. 701, 711-712 (1989). The definition of involuntary manslaughter, a common-law crime, is "an unlawful homicide unintentionally caused by an act that constitutes such a disregard of the probable harmful consequences to another as to amount to wanton or reckless conduct." *Commonwealth* v. *Jones*, 382 Mass. at 389. See *Commonwealth* v. *Welansky*, 316 Mass. 383, 399 (1944). See also G. L. c. 265, § 13.

Nor is there any question that the two offenses address different legislative goals. (We take G. L. c. 265, § 13, as an endorsement of the common-law elements of involuntary manslaughter.) Burning a dwelling is a crime against property; involuntary manslaughter is a crime against the person. See *Commonwealth* v. *Jones*, 382 Mass. at 390. The defendant claims, however, that because the single act of setting the fire not only burned the building but also caused the victim's death, the crimes are duplicative even if they have different elements.

As the concurrence indicates, whether the defendant is entitled to have her conviction of arson vacated raises issues that have received different treatment over the years. The most recent analysis from the Supreme Judicial Court may be found in *Commonwealth* v. *Jones*, 441 Mass. 73, 74 (2004), where the court summarized "the law governing an assertion that convictions are duplicative." In that analysis, the court started with a review of the approach set out in *Morey* v. *Commonwealth*, 108 Mass. 433, and its progeny, based on the elements of the crimes at issue. *Commonwealth* v. *Jones*, 441 Mass. at 74-75. The court then observed that "[a]t the same time, a court may examine whether the actions of a defendant were 'so closely related in fact as to constitute in substance but a single crime.' *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 662-663 (1979)." *Commonwealth* v. *Jones*, 441 Mass. at 75, quoting from *Commonwealth* v. *Valliere*, 437 Mass. at 371.

After careful consideration, we conclude that we need not decide which mode of analysis governs in this case, because under either approach, both convictions are appropriate. And so the prosecutor argued. His closing argument acknowledged that the defendant's action in starting the fire was the key act for both crimes. However, he also pointed out that there was other

conduct related to the involuntary manslaughter charge that was not relevant to the arson charge. As the prosecutor argued, the reckless conduct required to prove manslaughter "need not only apply to the [victim]," or "to any specific person, but [to] anybody who could be gravely hurt or killed," including those who could be called to fight the fire or search the house for other possible victims.

Thus, in this case, the defendant not only set the fire, but also left the house without checking to see whether anyone was inside, even though she knew that the house, although abandoned, was used by members of the local homeless community, including the defendant, the victim, and others whom she knew, as a place to sleep. See *Commonwealth* v. *Levesque*, 436 Mass. 443, 449 (2002) ("a duty to prevent harm to others arises when one creates a dangerous situation, whether that situation was created intentionally or negligently").

The defendant was properly convicted of and sentenced for both the burning of the dwelling and involuntary manslaughter.

*Judgments affirmed.*

Brown, J. (concurring in result). While I agree with the result reached by the majority, I write separately to set out my views on the current state of the law relating to duplicative convictions.

*Alleged duplicative convictions.* As noted, the defendant was convicted of arson of a dwelling and involuntary manslaughter. Citing *Commonwealth* v. *Morin*, 52 Mass. App. Ct. 780, 787 (2001), she now alleges that these two crimes "were so closely related in fact as to constitute but a single act" and, as a result, that her convictions are impermissibly duplicative — i.e., the convictions (and associated judgments) transgress double jeopardy principles. According to the defendant, multiple convictions "based on the identical conduct" are impermissible even where, as here, neither crime is a lesser included offense of the other. This represents a fundamental misapprehension of the law relating to duplicative offenses. While both convictions inarguably stem from precisely the same criminal acts, the compound punishments in this case are entirely consistent with the settled law of the Commonwealth.

As the Supreme Judicial Court has repeatedly declared, "a defendant may properly be punished for two crimes arising out of the same course of conduct provided that each crime requires proof of an element that the other does not." *Commonwealth* v. *Jones*, 441 Mass. 73, 75 (2004), quoting from *Commonwealth* v. *Valliere*, 437 Mass. 366, 371 (2002). In applying this rule, as the Supreme Judicial Court recently reiterated, "*the actual criminal acts alleged are wholly irrelevant . . .* rather, the elements of the crimes charged are considered objectively, abstracted from the facts" (emphasis added). *Commonwealth* v. *Jones*, 441 Mass. at 76, quoting from *Commonwealth* v. *Jones*, 59 Mass. App. Ct. 157, 162 (2003). Consistent with this approach, both this court and the Supreme Judicial Court have approved multiple convictions on the basis of a single act in a very large number of decisions. See *Commonwealth* v. *Buckley*, 410 Mass. 209, 222, 223 (1991) (murder and armed robbery); *Commonwealth* v. *Charles*, 428 Mass. 672, 683 (1999) (insurance fraud and larceny); *Commonwealth* v. *Jones*, 441 Mass. at 75-76 (burning a motor vehicle and burning insured property with intent to defraud insurer); *Commonwealth* v. *Arriaga*, 44 Mass. App. Ct. 382, 386-387 (1998) (assault with a dangerous weapon and assault with intent to murder); *Commonwealth* v. *Diaz*, 53 Mass. App. Ct. 209, 211 (2001) (assault and battery with a dangerous weapon and assault with intent to murder). See also *Commonwealth* v. *Anolik*, 27 Mass. App. Ct. 701, 712 (1989) (burning of a dwelling and burning of insured property), cited with approval in *Commonwealth* v. *Jones*, 441 Mass. at 76. The multiple convictions here are likewise proper, premised as they are upon offenses that contain mutually exclusive elements. See *Morey* v. *Commonwealth*, 108 Mass. 433, 434 (1871), cited with approval in *Commonwealth* v. *Jones*, 441 Mass. at 75.

We note for the purposes of clarity that there are circumstances in which conduct *is* relevant for assessing whether convictions are impermissibly duplicative; namely, where "cognate offenses"[1] are charged. In such cases, multiple convictions are permissible only where each conviction is premised

---

[1]Cognate offenses are those where one crime is a lesser included offense of the other or where there are multiple counts of the same offense.

upon a distinct criminal act. This rule is easy to apply where the acts alleged are plainly separate in terms of time, place, victim, or purpose. However, the analysis is less straightforward in the context of a closely connected stream of events. In such cases, when assessing whether a continuous course of criminal conduct may be separated into discrete acts capable of supporting multiple convictions *for cognate offenses*, a court frequently must consider "whether the actions of a defendant were 'so closely related in fact as to constitute in substance but a single crime.' *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 662-663 (1979)." *Commonwealth* v. *Jones*, 441 Mass. at 75. See *Commonwealth* v. *Sanchez*, 405 Mass. 369, 381-382 (1989) (indecent assault and battery and rape in the context of multiple victims); *Commonwealth* v. *Mamay*, 407 Mass. 412, 418-419 (1990) (indecent assault and battery and rape); *Commonwealth* v. *Maldonado*, 429 Mass. 502, 509-510 (1999) ("single crime" analysis applied where assault and battery with a dangerous weapon and murder charged). Cf. *Commonwealth* v. *LaCaprucia*, 429 Mass. 440, 445-447 (1999) (sexual assault case involving multiple counts of same offense); *Commonwealth* v. *Valliere*, 437 Mass. 366, 371-372 (2002) (armed robbery and felony murder with armed robbery as underlying felony).

To take a familiar illustration, the question "whether the actions of a defendant were so closely related in fact as to constitute in substance but a single crime," *Commonwealth* v. *Jones*, 441 Mass. at 75, arises frequently in cases of sexual assault. In *Commonwealth* v. *Thomas*, 401 Mass. 109, 119-120 (1987), for example, a defendant was convicted of both indecent assault and battery and forcible rape. To the extent that the former is a lesser included offense of the latter, see *Commonwealth* v. *Egerton*, 396 Mass. 499, 503 n.3 (1986), the two convictions could stand only if each conviction were premised on a separate act — e.g., an indecent touching distinct from the act of penetration. After a review of the record, the court in *Thomas* concluded that the defendant's actions, united in time, place, and purpose, "were so closely related in fact as to constitute in substance but a single crime," and on that basis vacated the conviction for the lesser included offense. *Id.* at 120, quoting from *Commonwealth* v. *St. Pierre*, 377 Mass. at

662-663. However, it is only in this context — where cognate crimes are charged — that the question whether actions are "so closely related as a matter of fact as to constitute in substance but a single crime" is material; where, as in the present case, the crimes charged have mutually exclusive elements, the nature of the conduct underlying the charges is "wholly irrelevant." *Commonwealth* v. *Jones*, 441 Mass. at 76, quoting from *Commonwealth* v. *Jones*, 59 Mass. App. Ct. at 162.

Thus, the defendant, by invoking the "so closely related in fact as to constitute in substance but a single crime" standard, has attempted to import an analytical approach that is utterly inapposite to her situation. Again, that standard is relevant only to the question of how many separate criminal acts a defendant has committed, not to the independent question whether multiple convictions based upon a single act are lawful. The latter depends solely on whether the crimes charged have mutually exclusive elements. Where they do, no further inquiry is required.

Over the years, the Supreme Judicial Court has repeatedly emphasized its reliance on such an elements-based approach to determining whether multiple convictions on the basis of a single act are permissible, frequently clarifying its own opinions to make this very point. In *Commonwealth* v. *Crocker*, 384 Mass. 353, 358-359 (1981), for example, the court expressly overruled *Commonwealth* v. *Catania*, 377 Mass. 186, 191 (1979), and *Commonwealth* v. *Cerveny*, 373 Mass. 345, 355-356 (1977), to the extent that either case "looked beyond the required elements of the statutory offenses . . . to the actual evidence introduced at . . . trial" in determining whether multiple convictions based upon a single act violated double jeopardy protections. Likewise, in *Commonwealth* v. *Jones*, 441 Mass. at 76, the Supreme Judicial Court sharply limited its holding in *Commonwealth* v. *Santos*, 440 Mass. 281, 292-294 (2003), a decision in which conduct arguably was considered in assessing whether multiple convictions for noncognate offenses was permissible. In *Jones*, the Supreme Judicial Court's most recent articulation of the law in this area, the court made it clear that nothing in *Santos* was intended to impugn the elements-

based approach, concluding its decision with the admonition that the "result [in *Santos*] . . . is case specific and does not modify the traditional rule in any respect." *Commonwealth* v. *Jones*, 441 Mass. at 77.

To summarize, multiple convictions based upon a single act are lawful provided that none of the crimes charged is a lesser included offense of any other. In determining whether one offense is included within another, courts must look exclusively to the statutory elements, without regard to the actual conduct alleged. Conduct is relevant only where a defendant is convicted of cognate crimes (as determined by reference to the latter elements-based standard), and only for the purpose of determining whether each conviction is based upon an independent act. Multiple convictions of cognate crimes are permissible only where such convictions are based on discrete acts. Here, to the extent that the defendant concedes that arson of a dwelling and manslaughter have mutually exclusive elements, the question whether the convictions are based on a single act or multiple acts is wholly irrelevant. In either case, there would be no infirmity in the multiple convictions.

Needless to say, to the extent that it is generally a simple matter to determine whether one offense is included within another, most appellate decisions involving the question of duplicative convictions present situations where the inquiry is focused on the comparatively thornier question of how many discrete acts, each capable of supporting an independent conviction, a particular defendant has committed. For this reason, the analysis in most cases involving alleged duplicative convictions is framed in terms of "whether the actions of a defendant were so closely related in fact as to constitute in substance but a single crime." However, as Tocqueville observed, the familiar should not be confused with the necessary.[2] Where noncognate offenses are charged, no inquiry into conduct is necessary. That is the situation here.

Before concluding, it is worth exploring the roots of the confusion that bedevils both the majority opinion, as well as decisions like *Commonwealth* v. *Morin*, 52 Mass. App. Ct. at

---

[2]See *Griffin* v. *Illinois*, 351 U.S. 12, 20 (1956) (Frankfurter, J., concurring).

787, the case on which the defendant chiefly relies. The notion that two offenses, while not greater and lesser crimes by reference to a pure elements-based test, may nonetheless be "so closely related in fact as to constitute in substance but a single crime," first arose in dicta in *Commonwealth* v. *St. Pierre*, 377 Mass. at 663. As noted above, this phrase was quickly coopted by cases focusing on the question whether a stream of related criminal conduct could be divided into separate and independent acts. This is the context in which that standard now is properly employed.

However, in its original context in *St. Pierre, supra*, as the cases cited there make plain, the phrase was intended to capture situations in which two offenses with small, technical differences in their statutory elements might nonetheless be deemed cognate crimes.[3] In *Costarelli* v. *Commonwealth*, 374 Mass. 677, 684 (1978), for example, the court concluded that use without authority is included within larceny of a motor vehicle, despite the fact that the latter does not require evidence of use on a public way. It was enough for the court that all of the elements ordinarily in issue where unauthorized use is charged are likewise elements of larceny of a motor vehicle. *Ibid.* A similar approach was adopted by the Supreme Judicial Court in *Commonwealth* v. *Walker*, 426 Mass. 301, 304-305 (1997). In *Walker*, the Supreme Judicial Court considered whether G. L. c. 265, § 13B, indecent assault and battery of a child under fourteen years of age, could be considered a lesser included offense of G. L. c. 265, § 22A, forcible rape of a child under sixteen years of age, in view of the disparity in the age thresholds. While conceding that the case presented a close question, the court ultimately concluded that the two offenses were, in fact, cognate crimes, at least where a victim, in fact, was aged less than fourteen years. *Id.* at 306.

This form of analysis, a minor departure from a strictly mechanical approach to the elements-based test for defining cognate crimes, nonetheless still examines "the elements of the

---

[3]*St. Pierre* itself involved the technical question whether assault and battery is a lesser included offense of both species of mayhem, i.e., actual mutilation and assault with intent to mutilate. *Commonwealth* v. *St. Pierre*, 377 Mass. at 661-662. See G. L. c. 265, § 14.

crimes charged . . . objectively, abstracted from the facts." *Commonwealth* v. *Jones*, 441 Mass. at 76, quoting from *Commonwealth* v. *Jones*, 59 Mass. App. Ct. 157, 162 (2003). However, to the extent that *St. Pierre*'s "so closely related in fact as to constitute in substance but a single crime" test is *now* commonly used in cases where conduct *is* relevant (that is, where cognate crimes are charged), it is perhaps easy to conflate the two applications of this standard — its original meaning in *St. Pierre* and its current use in "separate acts" analysis — and mistakenly arrive at the conclusion that (a) the elements-based test is subject to exceptions, and (b) conduct is relevant to determining whether such an exception applies in a particular case. That, however, is not the law.[4]

Another potential source of confusion is the fact that some decisions take a belt-and-suspenders approach to rebutting claims of duplicative convictions; that is to say, they consider both whether the crimes charged are cognate offenses *and* whether the offenses may be pegged to separate acts. This provides additional emphasis in situations where either approach will provide a basis for affirmance. Typical of this category is *Commonwealth* v. *Wolinski*, 431 Mass. 228, 238-239 (2000). In *Wolinski*, the defendant was charged with assault and battery by means of a dangerous weapon and armed robbery. First, the court engaged in a strict elements-based review of the two offenses and concluded that the convictions were not duplicative "because each crime required proof of a fact that the other did not." *Id.* at 238. Then, the court noted, as an

---

[4]It is also worth noting that it is unclear whether this portion of *St. Pierre* survived *Commonwealth* v. *Crocker*, 384 Mass. at 358-359, decided two years later. As noted, *Crocker* overruled *Commonwealth* v. *Catania*, 377 Mass. at 191, one of the cases on which the relevant dicta in *St. Pierre* relied. See *Commonwealth* v. *Arriaga*, 44 Mass. App. Ct. at 387-388 (dicta in *St. Pierre* that is at odds with strict elements-based approach to defining cognate crimes was overruled by *Crocker*); Michel, Multiple Convictions Based on a Single Act, 86 Mass. L. Rev. 165, 166-167 (2002) (*St. Pierre* relevant only to cases involving cognate crimes). Along these lines, no Supreme Judicial Court decision since *Crocker* — at least none that was not subsequently overruled or limited — has ever held that convictions were duplicative when the crimes charged had mutually exclusive elements under a strict elements-based test. *Commonwealth* v. *Walker*, 426 Mass. at 303, did not actually involve alleged duplicative convictions, but rather was focused on the propriety of the trial judge's lesser included offense instructions.

independent basis for affirmance, that the jury could have concluded that the two convictions were, in any event, based on separate acts. *Id.* at 239. However, the court made it clear that these were alternate bases for affirmance; either would have been sufficient to defeat the defendant's allegations of duplication.

A case like *Wolinski*, however, might be misinterpreted to stand for the proposition that unless a court finds both separate acts *and* noncognate offenses, multiple convictions violate double jeopardy protections. This misconstrues the law. Either is sufficient, standing alone, to support multiple convictions.

In any event, as the multiple convictions here are proper, I concur in the majority's result.