COMMONWEALTH *vs.* JONATHAN VICK.

Middlesex. April 6, 2009. - July 30, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Practice, Criminal,* Instructions to jury, Lesser included offense, Duplicative convictions. *Evidence,* Consciousness of guilt, Flight. *Armed Assault with Intent to Murder. Malice.*

At a criminal trial, the judge did not err in instructing the jury, over the defendant's objection, that they could consider his alleged flight and his false statements to the police as evidence of consciousness of guilt, and the judge's instructions to the jury were well balanced and fully complied with relevant standards. [422-427] BOTSFORD, J., concurring in part and dissenting in part, with whom CORDY, J., joined.

At a criminal trial, the judge did not err in declining to instruct the jury on armed assault with intent to kill as a lesser included offense of armed assault with intent to murder, where no credible evidence of mitigating circumstances was introduced in the first instance, and where, moreover, the Commonwealth presented evidence that the victim was not armed and had nothing in his hands when he approached the defendant. [428-430]

A criminal defendant's conviction of assault and battery by means of a dangerous weapon causing serious bodily injury was not duplicative of his conviction of armed assault with intent to murder, where each crime, although arising out of the same course of conduct, required proof of an element that the other did not. [430-433]

Statement that this court's well-established, elements-based approach to analyzing purported duplicative convictions, as first articulated in *Morey* v. *Commonwealth*, 108 Mass. 433 (1871), does not permit a conduct-based analysis of the facts of a particular case to determine whether a defendant's acts in one criminal event are so closely related as to constitute in substance a single crime such that the defendant can be punished only for the greater offense, a question that becomes pertinent in a single criminal proceeding where one crime is a lesser included offense of the other, or where there are multiple counts of the same offense. [433-436]

INDICTMENTS found and returned in the Superior Court Department on October 31, 2006.

The cases were tried before *Thomas A. Connors*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Peter M. Onek*, Committee for Public Counsel Services, for the defendant.

*Denise J. Casper*, Assistant District Attorney (*Elizabeth Keeley*, Assistant District Attorney, with her) for the Commonwealth.

SPINA, J. A Superior Court jury convicted the defendant, Jonathan Vick, of armed assault with intent to murder, assault and battery by means of a dangerous weapon causing serious bodily injury, unlawful possession of a firearm, and unlawful possession of ammunition for the shooting of Hakeem Shepherd in Everett on July 27, 2006.[1] The defendant appealed from his convictions, and we granted his application for direct appellate review. The defendant now contends that (1) the judge erred in instructing the jury, over his objection, that they could consider his alleged flight and his statements to the police as evidence of consciousness of guilt; (2) the judge erred in refusing to instruct the jury that they should return a verdict of armed assault with intent to kill, rather than armed assault with intent to murder, if they determined that the Commonwealth had failed to prove the absence of mitigation beyond a reasonable doubt; and (3) his conviction of assault and battery by means of a dangerous weapon causing serious bodily injury was duplicative of his conviction of armed assault with intent to murder. For the reasons that follow, we affirm the defendant's convictions.

1. *Background.* We recite the facts the jury could have found, leaving certain facts for development in the discussion of the issues.

On the morning of the shooting, Stephen Reid was sitting in his parked truck on Ferry Street, near Glendale Park, waiting for his coworker, Bernard Lloyd, Jr., to run an errand when two young black males emerged from a side street, joined up with a third, and walked past his vehicle. Reid heard one of them say,

---

[1] On the conviction of armed assault with intent to murder, the defendant was sentenced to a term of incarceration of from eight to ten years in the Massachusetts Correctional Institution at Cedar Junction. He was sentenced to a concurrent term of incarceration of from two to three years for the conviction of unlawful possession of a firearm. On the convictions of assault and battery by means of a dangerous weapon causing serious bodily injury and unlawful possession of ammunition, the defendant was sentenced to concurrent probationary terms of four years, to run from and after the expiration of his incarceration.

"[L]et's go get this f'n kid," as if looking for a fight. The three young men proceeded to walk down the middle of the street, impeding the flow of traffic. After Lloyd returned from his errand and climbed into the truck, he and Reid began to drive down Ferry Street, but they soon had to stop when another group of young black males (five or six in number) emerged from Glendale Park and an altercation between the two groups erupted in the middle of the street.

Reid and Lloyd had a close, clear, and unobstructed view of the altercation. They observed that the two groups were very agitated, pushing and shoving each other, arguing, hopping up and down, and sticking their fingers in each other's chests. Reid testified at trial that a member of the group from Glendale Park, who was wearing a distinctive black T-shirt with white writing on it[2] over what appeared to be a white undershirt and a black "do-rag" on his head, and who was later identified by that T-shirt as the defendant, began fighting with the victim, Hakeem Shepherd. The victim testified that he had been "the first one to run up," expecting to engage the group from Glendale Park in a fist fight. During the course of this fight, the defendant pulled a gun from his waistband and shot the victim once in the chest at close range. The victim was not armed. Right after he was shot, the victim ran to a nearby video store, while the defendant and his group ran back into Glendale Park. Reid and Lloyd immediately approached Officer Matthew Cunningham to report the shooting, telling him what they had seen and informing him that the defendant and his group had fled into Glendale Park. Lloyd testified at trial that the entire incident unfolded very quickly.

Everett police Officer Michael Marchese responded to the scene and found the victim lying on the floor inside Superstar Video, his white T-shirt covered in blood and a gunshot wound through the right side of his chest. When Officer Marchese asked the victim who had shot him, he replied, "somebody from Boston." Shortly thereafter, the victim was transported to Massachusetts General Hospital, where he spent five or six days

[2]This T-shirt was identified as the black Trix shirt because it bore the logo of the Trix rabbit and the caption "Trix are for pimps." Trix is a brand of breakfast cereal made by General Mills for the North American market. For advertising and marketing purposes, the Trix rabbit, an anthropomorphic cartoon rabbit, is a symbol of the product.

recovering. At trial, the victim would not identify his shooter, explaining, "You can't snitch."

In the meantime, Officer Cunningham ran into Glendale Park, which was filled with people, many of whom were using the swimming pool and recreation center. He approached a trio of black males, one of whom, later identified as Dion Smith, was carrying a backpack. When Officer Cunningham ordered the men to stop, Smith tried to give the backpack to the other two, but they would not take it. Smith ran toward a park exit with the backpack in hand. While in pursuit, Officer Cunningham saw Smith remove his white T-shirt, put it into the backpack, and throw the backpack into a barrel in a row of trash barrels. Officer Cunningham immediately retrieved the backpack and discovered that it contained a white T-shirt and a firearm. Officer Cunningham secured the backpack and its contents, and then assisted with the capture of Smith. Also apprehended were Tyrique Scott, John Pelzer, and William Deans, none of whom was carrying a weapon. While these individuals were being taken into custody, Officer Joseph Imbornone observed the defendant, still wearing the black Trix T-shirt, walking away from the area. Detective Alan Peluso, who was assisting Officer Imbornone, detained and arrested the defendant.

The defendant was handcuffed and escorted to an area in Glendale Park directly across from the Everett police station where the other individuals who had been arrested were being held. At this point, Reid and Lloyd were standing across the two-lane street from the group of detained individuals, whom the police had positioned along a chainlink fence. The police asked Lloyd if he could see the person who had done the shooting, and he identified the defendant "[b]y his Tricks t-shirt." The police asked Reid to point out to them the individual who was the shooter, and Reid identified the defendant by the same shirt, adding that he specifically remembered "the white collar around the neck." The defendant then was escorted to the police station. He was placed in a holding cell along with the other young men who had been arrested in connection with the incident. At the time he entered the holding cell, the defendant was wearing the black Trix T-Shirt, and William Deans, the defendant's cousin, was wearing a white T-shirt. Later, Deans had on the black Trix T-shirt, and the defendant was wearing just his undershirt.

That same evening, the defendant spoke with State Trooper Kevin Baker and Everett Detective Alfred Sabella. After indicating that he understood the Miranda warnings and signing a Miranda waiver form, the defendant refused to give permission for the tape recording of his interview, but he agreed to speak with the officers. During the course of a thirty to forty-five minute interview, the defendant provided his address in the Roxbury section of Boston. He claimed that he had come to Everett "to chill" with his cousin William, and that he had no issues or problems with anyone in the area. The defendant told the officers that, at the time of the shooting, his group had been walking to the swimming pool operated by the Metropolitan District Commission (MDC) in Everett, down the street from where the shooting occurred. He claimed that, after hearing the sound of one gunshot, he saw nothing out of the ordinary, his group continued walking, and they were arrested a short time later. The defendant admitted that the black Trix T-shirt was his and that he had been wearing it all day, but the defendant said that he had given it to Deans in the holding cell because his cousin was cold.

Erica Blais, a chemist with the State police crime laboratory, testified that the defendant's black T-shirt tested negative for blood and gunshot residue. The firearm recovered from the backpack was examined, and its cylinder was discovered to contain a discharged cartridge casing (from one shot fired) and two live rounds (which had not yet been fired).[3] The revolver was dusted for fingerprints, but there was insufficient ridge detail for comparison. The firearm's handle, trigger, and hammer, and the cartridge casing and ammunition, were all swabbed for deoxyribonucleic acid (DNA), but no DNA testing was performed.

At trial, the theory of the defense was that the defendant had been misidentified as the shooter and that no forensic evidence otherwise tied him to the scene of the crime. At the conclusion of the Commonwealth's case, the defendant made an oral motion for required findings of not guilty, which was denied. The defendant then rested his case without presenting any witnesses or evidence.

2. *Instruction on consciousness of guilt.*[4] The defendant first

---

[3]The defendant did not have a firearm identification (FID) card or a license to carry a firearm in Massachusetts.

[4]The judge gave the following instruction on consciousness of guilt: "Now,

contends that the judge erred in instructing the jury, over his objection, that they could consider his alleged flight from the scene and his statements to the police as evidence of consciousness of guilt. He asserts that the grounds for the prosecutor's request for such an instruction were evidence that: the defendant was observed "walking away from the area" where the shooting occurred; he told Trooper Baker that, at the time of the shooting, he simply was going to the nearby MDC swimming pool with his cousin; and he told Trooper Baker that, while in the holding cell, he had given his black Trix T-shirt to his cousin because his cousin was cold. The defendant argues that none of this evidence indicated a consciousness of guilt. Further, the defendant continues, the judge's instruction was highly prejudicial because it improperly suggested to the jury that his statements and actions may have had criminal connotations when, in the defendant's view, the evidence against him was far from overwhelming. We conclude that in the circumstances of this case, it was proper for the judge to give an instruction on consciousness of guilt with respect to the defendant's statements to the police and his alleged flight.[5]

"Consciousness of guilt instructions are permissible when

it's for you jurors to determine what evidence you heard during the trial and what evidence is credible to you. You may have heard evidence suggesting that the defendant may have fled from the scene that a shooting occurred. And, you may also have heard testimony that the defendant may have made false or misleading statements to the police after the time of his arrest. And, I want to stress to you, it's for you to determine what the evidence in the case is. If the Commonwealth has proven to you such conduct you may consider whether such actions indicate feelings of guilt by the defendant, and whether in turn such feelings of guilt might tend to show actual guilt on these charges. You are not required to draw such inferences. And, you should not do so unless they appear to be reasonable in light of all the circumstances of this case. If you decide that such inferences are reasonable it will be up to you to decide how much importance to give them. However, you should always remember there may be numerous reasons why an innocent person might do such things. Such conduct does not necessarily reflect feelings of guilt. Please also bear in mind that a person having feelings of guilt is not necessarily guilty in fact, for such feelings are sometimes found in innocent people. Finally, remember that standing alone such evidence is never enough by itself to convict a person of a crime. You may not find the defendant guilty on such evidence alone, but you may consider it in your deliberations along with all of the other evidence."

[5]Both parties agree that the standard of review is prejudicial error. At the charge conference, defense counsel objected to the giving of a consciousness of guilt instruction. The judge considered the defendant's argument, rejected it, and gave the instruction. In these circumstances, the issue was properly preserved

there is an 'inference of guilt that may be drawn from evidence of flight, concealment, or similar acts,' such as false statements to the police, destruction or concealment of evidence, or bribing or threatening a witness." *Commonwealth* v. *Stuckich*, 450 Mass. 449, 453 (2008), quoting *Commonwealth* v. *Toney*, 385 Mass. 575, 584 & n.4 (1982). See *Commonwealth* v. *Porter*, 384 Mass. 647, 653 (1981) (evidence "susceptible of a finding" that defendant "embarked on a series of actions consciously designed to deflect attention from himself" may indicate consciousness of guilt). The giving of this instruction presupposes that there is evidence of consciousness of guilt, communicates to the jury the judge's belief that there is such evidence, and directs the jury to decide whether to credit this evidence, and, if so, how to factor it into their deliberations. See *Commonwealth* v. *Stuckich*, *supra* at 454. While a conviction may not be based solely on evidence of consciousness of guilt, see *Commonwealth* v. *Darnell D.*, 445 Mass. 670, 674 (2005), indications of a defendant's state of mind, coupled with other evidence, can be sufficient to establish guilt. See *Commonwealth* v. *Doucette*, 408 Mass. 454, 461 (1990).

We consider first the defendant's statements to Trooper Baker that, at the time of the shooting near Glendale Park, he and his cousin happened to be en route to the nearby MDC swimming pool, and that, while in the holding cell, he gave his cousin the black Trix T-shirt because his cousin was cold. "False statements to police may be considered as consciousness of guilt if there is other evidence tending to prove the falsity of the statements." *Commonwealth* v. *Robles*, 423 Mass. 62, 71 (1996). See *Commonwealth* v. *Carrion*, 407 Mass. 263, 276 (1990) ("False statements made to the police are a standard example of admissible evidence on consciousness of guilt"); *Commonwealth* v. *Eppich*, 342 Mass. 487, 492 (1961) (false statements, particularly when coupled with other incriminating evidence, may be indicative of consciousness of guilt); *Commonwealth* v. *Mitchell*, 20 Mass. App. Ct. 902 (1985) (defendant's statement to police that

for appeal. See *Commonwealth* v. *Prater*, 431 Mass. 86, 97 (2000); *Commonwealth* v. *Biancardi*, 421 Mass. 251, 253-254 (1995). Thus, we consider whether the judge erred, and, if so, whether "we can be certain that the improper instruction 'did not influence the jury, or had but very slight effect.' " *Commonwealth* v. *Stuckich*, 450 Mass. 449, 453 (2008), quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

he was "partying" at time of alleged burglary, when taken in conjunction with evidence that defendant's coat was covered in construction dust found near crime scene, could be considered evidence of consciousness of guilt). A judge does not err in instructing a jury that, if they find that a defendant has made false statements to the police, then they can consider the statements as evidence of consciousness of guilt.[6] See *Commonwealth* v. *Robles, supra.*

The Commonwealth presented evidence that an individual wearing the same distinctive T-shirt as the defendant was observed engaging in an altercation with the victim on Ferry Street and then fleeing into Glendale Park. There was no evidence that, when the police apprehended the defendant's cousin shortly thereafter, the defendant was in his company. Rather, Detective Peluso testified that he apprehended the defendant's cousin and turned him over to the custody of other officers. He then ran down the sidewalk, met up with Officer Imbornone to provide assistance, and then stopped the defendant who was walking away from the area (and from his cousin). The jury reasonably could infer that, when the shooting occurred, the defendant was not simply on his way to the pool with his cousin, and that his postarrest statement to the police to that effect was false, which would be suggestive of consciousness of guilt.

Similarly, the jury heard testimony that video cameras monitor the activities that occur in the holding cell of the Everett police station. Detective Peluso testified that although the defendant was wearing the black Trix T-shirt when he entered the holding cell, the defendant's cousin was subsequently observed wearing the shirt. Earlier in the day, at the scene of the shooting, Reid

---

[6]We disagree with the view taken by Justice Botsford regarding the defendant's statement to the police that he gave his cousin the black Trix T-shirt because his cousin was cold. *Post* at 437-438. Notwithstanding the defendant's acknowledgment to the police that he had been wearing that shirt all day, the jury reasonably could believe that the defendant gave his cousin the distinctive shirt not because he wanted to fool the police, but because he wanted to fool other potential eyewitnesses who might come forward during the ongoing investigation then in progress. Where the jury reasonably could infer that the defendant's statement was false, there was a permissible foundation for a consciousness of guilt instruction. Whether the statement was false was a jury question, as the judge correctly instructed. See note 4, *supra.*

and Lloyd had identified the defendant as the shooter by his distinctive black Trix T-shirt. The jury reasonably could infer that, once they were in the holding cell, the defendant removed this T-shirt and gave it to his cousin to wear so that the defendant could not be identified by potential eyewitnesses as the perpetrator of the crime based on the particular clothing he was wearing. As such, the jury could further infer that the defendant's postarrest statement to the police that he gave his cousin the black Trix T-shirt because his cousin was cold was false, which would be suggestive of consciousness of guilt.

We turn next to the defendant's alleged flight from the scene of the shooting. It is well established that flight constitutes classic evidence of consciousness of guilt. See *Commonwealth* v. *Carrion, supra* at 277; *Commonwealth* v. *Booker*, 386 Mass. 466, 470 (1982); *Commonwealth* v. *Toney, supra* at 583. The defendant relies on *Commonwealth* v. *Groce*, 25 Mass. App. Ct. 327, 331-332 (1988) (*Groce*), to support his contention that the testimony from Reid and Lloyd that the shooter and his companions fled into Glendale Park did not warrant a consciousness of guilt instruction. In *Groce*, the judge, sua sponte, gave an instruction on consciousness of guilt based on evidence that the robber fled from the scene of the crime after grabbing the victim's handbag. The only issue at trial was whether the defendant was the one who had committed the crime; the defendant denied being in the vicinity at the time the robbery occurred. *Id.* at 329, 331-332. In reversing the defendant's conviction of unarmed robbery, the Appeals Court opined: "The evidence of the assailant's flight with the fruits of the robbery did not shed any light on the issue of identification; it did not give rise to a reasonable inference that the defendant was the assailant. The instruction, therefore, given the posture of the case, was inapposite." *Id.* at 332. The Appeals Court concluded that, based on its review of the entire instruction, the judge "may well have conveyed the notion to the jury that he believed that it was the defendant who fled and, thus, that the victim's identification testimony was accurate." *Id.*

Here, the judge conveyed no such notion to the jury. To the contrary, the judge's instruction on consciousness of guilt was well balanced and fully complied with the standards set forth in *Commonwealth* v. *Toney, supra* at 585. See *Commonwealth* v. *Pina*, 430 Mass. 266, 271-272 (1999); *Commonwealth* v. *Hors-*

*man*, 47 Mass. App. Ct. 262, 268 (1999). The judge emphasized to the jury that *they* must determine the evidence in the case, and that *they* were not required to draw inferences from conduct that might suggest consciousness of guilt. See note 4, *supra*. Unlike *Groce*, the victim here did not identify the defendant as the perpetrator, nor did the defendant claim that he was not in the vicinity of the shooting when it occurred. Consequently, evidence of his flight from the scene, which was descriptive of the defendant, shed light on the issue of identification. Moreover, unlike *Groce*, there was in this case additional, independent consciousness of guilt evidence — the defendant's false statements to the police. See *Commonwealth* v. *Horsman*, *supra* at 267. The defendant's flight from the immediate scene of the shooting contradicted his explanation to the police that his presence in the park was happenstance — he was merely passing through on his way to the MDC swimming pool — and could be considered by the jury as consciousness of guilt.[7] Unlike *Groce*, the jury here could have found that the defendant fled from the immediate scene of the shooting and made false statements to the police without already having determined that the defendant was the shooter. We conclude that there was no error.[8]

[7]Justice Botsford takes issue with our reliance on evidence that the defendant fled the immediate scene of the shooting, rather than walking from the scene where his friends had been arrested, as the Commonwealth had argued. *Post* at 438-439. We have relied on the evidence that the judge relied on when deciding to give the consciousness of guilt instruction. The Commonwealth had presented testimony from Reid and Lloyd that the defendant and his group had fled into Glendale Park immediately after the victim was shot. Further, in his discussion with the prosecutor and defense counsel about the jury instructions, the judge indicated that the Commonwealth was looking for an instruction about the defendant's flight from the scene into the park.

[8]With respect to evidence of flight, the Commonwealth asserts that the jury reasonably could have found that the defendant "fled" the scene of the crime when, as the police swarmed into Glendale Park, he "walk[ed] away from the area" where the officers were arresting his companions. Based on this finding, the Commonwealth posits that the jury could infer consciousness of guilt. We agree with the defendant that "walking" in the park, even in the vicinity of a crime scene, does not constitute "fleeing" from the scene. See *Commonwealth* v. *Brown*, 414 Mass. 123, 126-127 (1993) (evidence that man seen walking away from crime scene did not look down from ridge at barking dogs, possibly to avoid identification, did not constitute evidence of flight "in any common sense of the term"). The defendant's conduct in this regard would not warrant a consciousness of guilt instruction on "flight."

3. *Instruction on armed assault with intent to kill.* The defend-
ant next contends that the judge erred in refusing to instruct the
jury on armed assault with intent to kill as a lesser included of-
fense of armed assault with intent to murder. In the defendant's
view, there was substantial evidence at trial suggesting that the
shooting had occurred in the course of heated and rapidly escalat-
ing combat between two groups of young males. This evidence,
the defendant argues, easily constituted "some credible evi-
dence" of mitigation that shifted the burden of proving an absence
of mitigation to the Commonwealth. The defendant asserts that
the jury should have been given the option of returning a verdict
of armed assault with intent to kill, rather than armed assault
with intent to murder, if they concluded that the Commonwealth
did not establish the absence of mitigation beyond a reasonable
doubt.[9] We disagree.

Armed assault with intent to murder requires proof of assault
(while armed with a dangerous weapon) and a specific intent to
kill that equates with malice. See G. L. c. 265, § 18 (*b*).[10] See
also *Commonwealth* v. *Johnston,* 446 Mass. 555, 558 (2006).
"Malice necessarily exists when specific intent to kill is proved
and there is no evidence of justification, excuse, or mitigation."[11]
*Id.* Mitigation reduces the crime from assault with intent to mur-
der to assault with intent to kill, a lesser included offense.[12] See
*id.* at 558 & n.3. The elements of assault with intent to kill are

---

[9]During the initial charge conference, defense counsel expressed doubt that
he could marshal the requisite foundational evidence for an instruction regard-
ing mitigation. Nonetheless, the next day, defense counsel informed the judge
and the Commonwealth that he was "still pressing for it." The judge rejected
defense counsel's requested instruction. Both parties agree that the standard of
review is prejudicial error. See *Commonwealth* v. *Prater,* 431 Mass. 86, 97
(2000); *Commonwealth* v. *Biancardi,* 421 Mass. 251, 254 (1995). See also
note 5, *supra.*

[10]General Laws c. 265, § 18 (*b*), states: "Whoever, being armed with a
dangerous weapon, assaults another with intent to rob or murder shall be
punished by imprisonment in the state prison for not more than twenty years.
Whoever, being armed with a firearm, shotgun, rifle, machine gun or assault
weapon assaults another with intent to rob or murder shall be punished by
imprisonment in state prison for not less than five years and not more than 20
years."

[11]The defendant has not argued that there was evidence of justification or
excuse. Therefore, we confine our discussion to the issue of mitigation.

[12]General Laws c. 265, § 29, states: "Whoever assaults another with intent
to commit a felony shall, if the punishment of such assault is not hereinbefore

"assault, specific intent to kill, *and* [a] mitigating factor." *Commonwealth* v. *Nardone,* 406 Mass. 123, 131 (1989). "Mitigation traditionally involves circumstances where we understand a defendant's intent to kill to arise from the frailty of human nature in the face of certain circumstances, such as heat of passion induced by reasonable provocation, sudden combat, or excessive force in self-defense." *Commonwealth* v. *Johnston, supra* at 558. See *Commonwealth* v. *Nardone, supra* at 130-131.

Mere words generally do not constitute sufficient provocation to warrant an instruction on a lesser included offense. See *Commonwealth* v. *Keohane,* 444 Mass. 563, 567 n.2 (2005); *Commonwealth* v. *Anderson,* 396 Mass. 306, 314 (1985). Even a physical confrontation initiated by the victim may not be sufficient. See *Commonwealth* v. *Pierce,* 419 Mass. 28, 31 (1994); *Commonwealth* v. *Walden,* 380 Mass. 724, 727 (1980). See also *Commonwealth* v. *Rembiszewski,* 363 Mass. 311, 321 (1973), *S.C.,* 391 Mass. 123 (1984) (scratches inflicted by victim did not serve as provocation for attack by defendant with deadly weapon). When considering what constitutes heat of passion induced by sudden combat, we are guided by the words of Chief Justice Lemuel Shaw in *Commonwealth* v. *Webster,* 5 Cush. 295, 308 (1850): "When two meet, not intending to quarrel, and angry words suddenly arise, and a conflict springs up in which blows are given on both sides, without much regard to who is the assailant, it is a mutual combat. And if no unfair advantage is taken in the outset, and the occasion is not sought for the purpose of gratifying malice, and one seizes a weapon and strikes a deadly blow, it is regarded as homicide in heat of blood . . . ." See *Commonwealth* v. *Clemente,* 452 Mass. 295, 320 (2008), cert. denied, 129 S. Ct. 1329 (2009); *Commonwealth* v. *Gaouette,* 66 Mass. App. Ct. 633, 640-641 (2006). Courts are reluctant to find mitigation warranting an instruction on a lesser included offense when the defendant confronts the victim while armed with a deadly weapon. See, e.g., *Commonwealth* v. *LaCava,* 438 Mass. 708, 721-723 (2003); *Commonwealth* v. *Bianchi,* 435 Mass. 316, 328-329 (2001); *Commonwealth* v. *Holmes,* 32 Mass. App. Ct. 906, 908 (1992).

provided, be punished by imprisonment in the state prison for not more than ten years or by a fine of not more than one thousand dollars and imprisonment in jail for not more than two and one half years."

We have stated that "once some credible evidence of mitigation is introduced, the Commonwealth bears the burden of proving an absence of mitigation beyond a reasonable doubt and the judge must instruct the jury accordingly." *Commonwealth* v. *Johnston, supra* at 561. Here, no credible evidence of mitigating circumstances was introduced in the first instance. The Commonwealth presented testimony that the defendant was part of a group of five or six young males involved in the altercation, whereas the victim was one among a group of three companions. The confrontation was characterized by pushing and shoving, arguing, and yelling. The victim testified that, although he was "the first one to run up," he anticipated that the two groups would engage in a fist fight. Moreover, the Commonwealth presented evidence that the victim was not armed and had nothing in his hands when he approached the defendant. It was the defendant who deliberately prepared himself for the possibility of a fatal confrontation by carrying a loaded firearm. This simply was not a case where a deadly blow was struck in the heat of passion brought about by reasonable provocation or sudden combat. Accordingly, the Commonwealth had no burden to prove the absence of mitigation beyond a reasonable doubt, and the judge was not required to instruct the jury on the lesser included offense of armed assault with intent to kill. See *Commonwealth* v. *Nardone, supra* at 132 (judge should not instruct jury on lesser included offense not suggested by reasonable view of evidence); *Commonwealth* v. *Egerton*, 396 Mass. 499, 503-505 (1986) (judge need not instruct jury on hypothesis unsupported by evidence).

4. *Duplicative convictions.* The defendant next contends, for the first time, that his conviction of assault and battery by means of a dangerous weapon causing serious bodily injury was duplicative of his conviction of armed assault with intent to murder.[13] The defendant acknowledges that, although the former crime is not, strictly speaking, a lesser included offense of the latter crime, see *Commonwealth* v. *Arriaga*, 44 Mass. App. Ct. 382, 385-386 (1998), the two offenses were so closely related in fact as to

[13]Where the defendant neither raised the issue of duplicative convictions before the trial court, nor filed a motion to revise or revoke the sentence under Mass. R. Crim. P. 29, 378 Mass. 899 (1979), we review his claim only to determine if a substantial risk of a miscarriage of justice occurred. See *Commonwealth* v. *Thomas*, 401 Mass. 109, 119 & n.11 (1987).

constitute in substance but one crime. In the defendant's view, the shooter's single swift act of raising the gun and firing comprised the entirety of the criminal event, and, therefore, the defendant's conviction of assault and battery by means of a dangerous weapon causing serious bodily injury should be vacated and that indictment dismissed. We disagree.

The traditional rule in Massachusetts, as embodied in *Morey* v. *Commonwealth*, 108 Mass. 433, 434 (1871) (*Morey*), and its progeny, is that "a defendant may properly be punished for two crimes arising out of the same course of conduct provided that each crime requires proof of an element that the other does not." *Commonwealth* v. *Valliere*, 437 Mass. 366, 371 (2002). See *Commonwealth* v. *Crocker*, 384 Mass. 353, 357-358 (1981); *Kuklis* v. *Commonwealth*, 361 Mass. 302, 306-307 (1972) (*Kuklis*). See also *Blockburger* v. *United States*, 284 U.S. 299, 304 (1932) (*Blockburger*). This elements-based approach remains the standard for determining whether multiple convictions stemming from one criminal transaction are duplicative. See *Commonwealth* v. *Cabrera*, 449 Mass. 825, 827 (2007); *Commonwealth* v. *Gallant*, 65 Mass. App. Ct. 409, 413 (2006); *Commonwealth* v. *Arriaga*, *supra* at 386-389. As long as each offense requires proof of an additional element that the other does not, "neither crime is a lesser-included offense of the other, and convictions on both are deemed to have been authorized by the Legislature and hence not [duplicative]." *Commonwealth* v. *Jones*, 382 Mass. 387, 393 (1981).

With respect to the application of this well-established rule, we have stated that "[t]he actual criminal acts alleged are wholly irrelevant . . . rather, the elements of the crimes charged are considered objectively, abstracted from the facts [of any particular case]." *Commonwealth* v. *Jones*, 441 Mass. 73, 76 (2004), quoting *Commonwealth* v. *Jones*, 59 Mass. App. Ct. 157, 162 (2003). See *Commonwealth* v. *Cabrera*, *supra*. "In other words, we consider only the elements of the crimes, not the facts to be proved or the evidence adduced to prove them." *Id.* See *Commonwealth* v. *Crocker*, *supra* at 359 (repudiating cases that "looked beyond the required elements of the statutory offenses . . . to the actual evidence introduced at the defendant's trial"). This elements-based approach recognizes "the role of the

Legislature as the primary body that creates, and defines, crimes, and the fact that, in punishing related offenses, the Legislature usually intends to further distinct policies." *Commonwealth* v. *Jones*, 441 Mass. at 75. See *Commonwealth* v. *Crocker, supra* at 360 (*Morey* rule is one of statutory interpretation for determining whether Legislature in particular situation authorized conviction and sentence under two statutory offenses). See also *Commonwealth* v. *Alvarez*, 413 Mass. 224, 231-232 (1992) (Legislature has broad power to define crimes and create punishments for them).

As already noted, the defendant was convicted of assault and battery by means of a dangerous weapon causing serious bodily injury, and armed assault with intent to murder. Assault and battery by means of a dangerous weapon causing serious bodily injury requires the Commonwealth to prove that the defendant intentionally touched the victim, however slightly; the touching was unjustified; the touching was done with an inherently dangerous weapon or an object used in a dangerous fashion; and the touching caused serious bodily injury.[14] See G. L. c. 265, § 15A (c) (i); *Commonwealth* v. *Appleby*, 380 Mass. 296, 306-307 (1980). Armed assault with intent to murder requires the Commonwealth to prove that the defendant assaulted the victim while armed with a dangerous weapon and that the defendant possessed the specific intent to cause the victim's death. See G. L. c. 265, § 18 (*b*); *Commonwealth* v. *Johnston*, 446 Mass. 555, 558 (2006). Each offense contains elements that the other does not. Armed assault with intent to murder requires proof of a specific intent to kill, whereas assault and battery by means of a dangerous weapon causing serious bodily injury requires only a showing of general intent. See *Salemme* v. *Commonwealth*, 370 Mass. 421, 424 (1976); *Commonwealth* v. *Arriaga, supra* at 386. Similarly, assault and battery by means of a dangerous weapon causing serious bodily injury requires proof of a battery, whereas armed assault with intent to murder does not. See *Salemme* v. *Commonwealth, supra*; *Commonwealth* v. *Arriaga, supra*. In addition, armed assault with intent to murder does not require proof that the assault was committed by use of the weapon,

---

[14]General Laws c. 265, § 15A (*d*), states that "serious bodily injury" shall mean "bodily injury which results in a permanent disfigurement, loss or impairment of a bodily function, limb or organ, or a substantial risk of death."

whereas assault and battery by means of a dangerous weapon causing serious bodily injury does. See *Salemme* v. *Commonwealth, supra*; *Commonwealth* v. *Diaz*, 53 Mass. App. Ct. 209, 213 n.6 (2001). Here, the *Morey* standard has been satisfied because assault and battery by means of a dangerous weapon causing serious bodily injury and armed assault with intent to murder are not the "same offense." Neither crime is a lesser included offense of the other, and, therefore, the Legislature has authorized punishment for both. We conclude that the defendant's multiple convictions and sentences were wholly appropriate and not duplicative.[15]

As the defendant rightly suggests, it may appear that our well-established, elements-based approach to analyzing purported duplicative convictions, as first articulated in *Morey*, has been expanded over the years to permit a conduct-based analysis of the facts of a particular case to determine whether a defendant's acts in one criminal event are so closely related as to constitute in substance a single crime such that the defendant can be punished only for the greater offense. See, e.g., *Commonwealth* v. *Cabrera, supra* at 827-828 (first analyzing elements of breaking and entering in nighttime with felonious intent and of receiving stolen property, then considering defendant's specific conduct); *Commonwealth* v. *Keohane*, 444 Mass. 563, 574-575 (2005) (stating that court continues to adhere to elements-based test of *Morey*, but that judge also may look at defendant's actions); *Commonwealth* v. *Jones*, 441 Mass. at 76 (first analyzing elements of burning motor vehicle and of burning insured property with intent to defraud insurer, then considering particular actions of defendant); *Commonwealth* v. *Wolinski*, 431 Mass. 228, 238-239 (2000)

---

[15]In a footnote in his brief, the defendant asserted that his alleged duplicative convictions violate double jeopardy principles. First, we point out that arguments relegated to a footnote do not rise to the level of appellate argument. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). See also *Commonwealth* v. *Lydon*, 413 Mass. 309, 317-318 (1992). Second, among other protections, the double jeopardy clause protects against multiple punishments for the same offense. See *Luk* v. *Commonwealth*, 421 Mass. 415, 419 (1995). See also *North Carolina* v. *Pearce*, 395 U.S. 711, 717-718 (1969); *Blockburger* v. *United States*, 284 U.S. 299, 304 (1932). In light of our conclusion that the defendant is not being subjected to multiple punishments for the same offense, we conclude that there has been no violation of double jeopardy principles.

(engaging in elements-based review of assault and battery by means of dangerous weapon and of armed robbery, then discussing defendant's specific acts); *Commonwealth* v. *Morin,* 52 Mass. App. Ct. 780, 787-788 (2001) (examining elements of crimes, followed by facts of defendant's conduct). That was not our intention. In *Commonwealth* v. *Crocker, supra* at 359, we stated that a departure from the elements-based *Morey* test, in favor of a judicial assessment of the evidence introduced in a single criminal trial of multiple offenses, "runs the risk of unnecessary intrusion into the legislative prerogative to define crimes and fix punishments." See *Commonwealth* v. *Oliveira,* 53 Mass. App. Ct. 480, 482-487 (2002) (distinct legislative policies embedded in statutes criminalizing indecent assault and battery and assault with intent to rape mandated conclusion that Legislature intended to punish each offense even though they arose from same criminal episode). We continue to adhere to this view.

To the extent that we have looked beyond legislative intent and the required elements of statutory offenses, and additionally focused on the facts of the criminal acts, a common source of authority for our analysis has been *Commonwealth* v. *St. Pierre,* 377 Mass. 650 (1979). There, we commented:

> "This court recognized in *Commonwealth* v. *Gallarelli,* 372 Mass. 573, 578-579 (1977), that the [*Morey*] rule could be manipulated by a prosecutor so as to harass and oppress. That was said in the context of successive prosecutions, but there may be an element of harassment in the use of multiple charges in the same prosecution when they open up a prospect of 'double' punishment for crimes not duplicative in the technical sense, but so closely related in fact as to constitute in substance but a single crime."

*Id.* at 662-663. However, nowhere in the *St. Pierre* case did this court suggest that the traditional elements-based approach enunciated in *Morey* should be supplemented with or replaced by a conduct-based approach for analyzing purported duplicative offenses. See *id.* See also *Commonwealth* v. *Gallarelli, supra* at 578 (disapproving adoption of "same transaction" rule and concluding that court was not "inclined as a matter of policy to modify [its] approval of the 'same evidence' rule as first clearly enunciated in *Morey*"); *Commonwealth* v. *Niels N.,* 73 Mass.

App. Ct. 689, 709-710 (2009) (Cypher, J., dissenting in part) (analyzing development of line of case departing from doctrinal principles of *Morey* and *Blockburger*); *Commonwealth* v. *Gallant*, 65 Mass. App. Ct. 409, 414-415 (2006) (stating that "it is difficult to see how such a conduct-based test could ever possibly mesh with the *Morey* standard"); *Commonwealth* v. *Arriaga, supra* at 386-389.

The question whether two offenses are "so closely related in fact as to constitute in substance but a single crime," *Commonwealth* v. *St. Pierre, supra,* becomes pertinent in a single criminal proceeding where one crime is a lesser included offense of the other, or where there are multiple counts of the same offense. See *Commonwealth* v. *King,* 445 Mass. 217, 225 (2005), cert. denied, 546 U.S. 1216 (2006) (convictions of greater and lesser included offenses "must rest on separate and distinct acts"); *Commonwealth* v. *Sanchez,* 405 Mass. 369, 381-382 (1989) (conduct-based analysis appropriate where crimes charged are greater and lesser offenses); *Commonwealth* v. *Gallant, supra* at 413-416 (distinguishing *Morey* test from conduct-based analysis); *Commonwealth* v. *Pileeki,* 62 Mass. App. Ct. 505, 515-517 (2004) (Brown, J., concurring in result) (same); *Commonwealth* v. *Howze,* 58 Mass. App. Ct. 147, 152-153 & n.7 (2003) (same); *Commonwealth* v. *Arriaga, supra* (same). See also *Commonwealth* v. *Crocker, supra* at 359 n.7 (same-conduct analysis also may be necessary in cases of successive prosecutions for offenses arising from one criminal transaction). In those circumstances, multiple convictions and sentences are permissible only where each conviction is premised on a distinct criminal act, unless the Legislature has explicitly authorized cumulative punishments.[16] See *Commonwealth* v. *King, supra* at 225-226, quoting *Commonwealth* v. *St. Pierre, supra* ("so closely related in fact as to constitute in substance but a single crime" standard applicable for determining how many discrete criminal acts defendant committed with respect to convictions of greater and lesser offenses); *Commonwealth* v. *Thomas,* 401 Mass. 109, 119-120 (1987); *Commonwealth* v. *Pileeki, supra.*[17] See also *Commonwealth* v. *Alvarez,* 413 Mass.

[16]Whether a defendant's actions constitute separate and distinct acts or must be considered a single crime is a question of fact for the jury to resolve. See *Commonwealth* v. *Maldonado,* 429 Mass. 502, 509 (1999).

[17]In his concurring opinion in *Commonwealth* v. *Pileeki,* 62 Mass. App. Ct.

224, 232 (1992) (Legislature specifically authorized imposition
of two consecutive sentences for violation of school zone statute
and lesser included offense of possession of cocaine with intent
to distribute). It bears repeating that where, as here, neither
crime is a lesser included offense of the other, multiple punish-
ments are permitted even where the offenses arise from the very
same criminal event. See *Morey* v. *Commonwealth*, 108 Mass.
433, 434 (1871).

*Judgments affirmed.*

BOTSFORD, J. (concurring in part and dissenting in part, with
whom Cordy, J., joins). I agree with the court that (1) no instruc-
tion on armed assault with intent to kill was warranted in this
case, and (2) the defendant's convictions of armed assault with
intent to murder and of assault and battery by means of a danger-
ous weapon were not duplicative. I disagree, however, that the
trial judge properly instructed the jury on consciousness of guilt.
Nevertheless, because I conclude that this error was harmless, I
concur in the court's conclusion that the judgments in this case
should be affirmed.

Before closing arguments, the prosecutor made a request to
the judge for a consciousness of guilt instruction. The prosecu-
tor supported the request with the argument that (1) the evidence
of the defendant's attempt to walk away from the scene in
Glendale Park where his companions and cousin were being ar-
rested suggested flight by the defendant; and (2) the defendant's

505 (2004), Justice Brown analyzed the current state of our law pertaining to
duplicative convictions, and his summary is instructive: "[M]ultiple convic-
tions based upon a single act are lawful provided that none of the crimes
charged is a lesser included offense of any other. In determining whether one
offense is included within another, courts must look exclusively to the statu-
tory elements, without regard to the actual conduct alleged. Conduct is relevant
only where a defendant is convicted of cognate crimes (as determined by
reference to the latter elements-based standard), and only for the purpose of
determining whether each conviction is based upon an independent act. Multiple
convictions of cognate crimes are permissible only where such convictions are
based on discrete acts." *Id.* at 518 (Brown, J., concurring in result). As further
explained, "[c]ognate offenses are those where one crime is a lesser included
offense of the other or where there are multiple counts of the same offense."
*Id.* at 515 n.1 (Brown, J., concurring in result).

statements to the police (a) that he was in the park to go to the pool with his cousin, and (b) that he had given his black Trix T-shirt to his cousin once in the jail because his cousin was cold, could be found to be false statements. The prosecutor's closing argument brought up these same grounds. As he had indicated he would (but over the defendant's objection), the judge instructed the jury on consciousness of guilt, mentioning specifically evidence suggesting flight from the scene by the defendant and false statements by the defendant as evidence that the jury might accept and might conclude indicated consciousness of guilt.[1]

I agree with the court that the judge's instruction conformed to the standards of *Commonwealth* v. *Toney*, 385 Mass. 575, 585 (1982), was well balanced, and properly emphasized that it was the jury's obligation to decide what the facts were in the case and what inferences to draw. See *ante* at 426. The difficulty lies with the nature of the evidence relied on by the judge and by this court to justify a consciousness of guilt instruction.[2]

The court discusses allegedly false statements by the defendant as the first possible basis for a finding of consciousness of guilt, and identifies two separate statements that in its view so qualify. I agree with the court's analysis about the first of these, namely, the defendant's statement to a State trooper that he was en route with his cousin to a swimming pool at the time of the shooting. See *ante* at 425. I do not agree about the second — the defendant's statement that he gave his cousin the T-shirt because his cousin was cold. The court states that the jury could infer that the defendant gave his cousin his T-shirt in the holding cell to prevent being identified by potential eyewitnesses. *Ante* at 425-426. However, this appears to be unfounded speculation on the court's part, given the fact that at the same time

---

[1]The judge said, specifically: "You may have heard evidence suggesting that the defendant may have fled from the scene that a shooting occurred. And you may also have heard testimony that the defendant may have made false or misleading statements to the police after the time of his arrest." See *ante* at 422 n.4, for the entire consciousness of guilt instruction.

[2]In his instruction to the jury, the judge first mentioned evidence of flight and then evidence of false statements, but the court here discusses evidence of false statements first and flight second. I follow the court's order in the following paragraphs.

the defendant explained to the police that he had given the T-shirt to his cousin to help with the cold, the defendant also acknowledged to them that he had been wearing that shirt all day.[3] In my view, this acknowledgment essentially removed the basis for any conclusion that the defendant was providing a false statement, and therefore a consciousness of guilt instruction premised on false statements should not have been given.

The court next considers the evidence of flight. It agrees with the defendant, as do I, that the evidence indicating the defendant walked away from the part of the park where the police were arresting his companions did not suggest "flight," and could not be the basis of an instruction on consciousness of guilt. *Ante* at 427 n.7. The court, however, points to the evidence that the defendant (and the group he was with) ran from the street where the shooting occurred back into Glendale Park and concludes that this qualified as "flight" evidence warranting the consciousness of guilt instruction. I disagree for two reasons. First, it is inappropriate for the court on appeal to rely on different evidence, not relied on or brought to the jury's attention by the parties or the judge, to justify the judge's inclusion of flight by the defendant as evidence suggesting consciousness of guilt.

Second, and more importantly, as in *Commonwealth* v. *Groce*, 25 Mass. App. Ct. 327, 331-332 (1988) (*Groce*), there is a fundamental question about the aptness and fairness of a consciousness of guilt instruction in a case such as this, where the defense is one of misidentification. Here, as in *Groce*, there was no doubt that a criminal event occurred, and there was no evidentiary basis on which to dispute that the shooter (along with his companions) ran away from the scene of the shooting into the park. The issue in controversy was whether the defendant was the shooter. There was evidence that the shooter was wearing a black Trix T-shirt, and evidence that the defendant was wearing a black Trix T-shirt on the day of the shooting and in particular when Stephen Reid and Bernard Lloyd, Jr., identified him to the police in the showup identification procedure conducted shortly after the shooting. But there is nothing about the fact that the assailant, wearing a black

---

[3]Furthermore, the only eyewitnesses (other than the victim) apparently known to the police, Stephen Reid and Bernard Lloyd, Jr., had already identified the defendant in the Trix T-shirt.

Trix T-shirt, ran from the scene of the shooting that would itself "give rise to a reasonable inference that the defendant was the assailant." *Groce, supra* at 332. In other words, for the jury to consider the evidence that the assailant "fled" from the immediate scene of the shooting as consciousness of guilt on the defendant's part, they would need first to conclude, based on separate evidence, that the defendant was in fact the shooter; otherwise, they would have no basis on which to ascribe the act of fleeing to the defendant at all.

In these circumstances, the judge's instruction to the jurors that they "may have heard evidence suggesting that the *defendant* may have fled from the scene" of the shooting essentially merged together what were necessarily two independent lines of inquiry for the jury: (1) whether the defendant was the assailant; and, if so, (2) whether his running from the shooting reflected consciousness of guilt. This conflation was not proper. See *Commonwealth* v. *Pina*, 430 Mass. 266, 272 (1999) ("As the Appeals Court [in *Groce*] reasoned, there is no rationale for a consciousness of guilt instruction where the only contested issue is identification and there is no dispute that the person fleeing the scene of the crime was the same as the assailant").

In the circumstances, where (as I view the evidence) it was not permissible for the jury to find consciousness of guilt based on one of the two proffered allegedly false statements or based on evidence of flight, I conclude that the particular instruction about consciousness of guilt given by the judge was error. Nevertheless, I also conclude that the error was not prejudicial. This is so in part because there was at least one allegedly false statement that would justify the giving of a consciousness of guilt instruction — and therefore this is not a case where it was error to give the instruction at all. Primarily, however, I reach the conclusion concerning the lack of prejudice because the identification evidence pointing to the defendant as the shooter, offered by Reid and Lloyd, was so strong. In the circumstances, I am confident that the jury's verdict "was not substantially swayed by the error." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). Accordingly, I concur in the affirmance of the defendant's convictions.