SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. DAVID K. NJUGUNA

 
 Docket:
 SJC-13654
 
 
 Dates:
 January 8, 2025 – May 5, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Dewar, JJ.
 
 
 County:
 Worcester
 

 
 Keywords:
 Homicide. Motor Vehicle, Homicide, Operating to endanger. Wanton or Reckless Conduct. Practice, Criminal, Duplicative convictions, Lesser included offense, Assistance of counsel, New trial. Statute, Construction. Witness, Impeachment
 
 

             Indictments found and returned in the Superior Court Department on May 18, 2016.
            The cases were heard by Janet Kenton-Walker, J., and a motion for a new trial, filed on December 9, 2021, was heard by her.
            After review by the Appeals Court, 104 Mass. App. Ct. 148 (2024), the Supreme Judicial Court granted leave to obtain further appellate review.
            Andrew P. Power for the defendant.
            Donna-Marie Haran, Assistant District Attorney, for the Commonwealth.
            James L. Sultan, for Mfouad A. Faris, amicus curiae, submitted a brief.
            GEORGES, J.  Around noon on March 16, 2016, the defendant crashed his vehicle into a State police cruiser stopped in the breakdown lane on Interstate Route 90, killing a trooper.  Following a bench trial, the trial judge convicted the defendant of involuntary manslaughter, misdemeanor motor vehicle homicide by means of negligent or reckless operation (motor vehicle homicide), operating a motor vehicle so as to endanger the lives or safety of the public (operating to endanger), and operating an uninsured motor vehicle, and subsequently denied the defendant's motion for a new trial.  The defendant appealed, contending that the Legislature did not authorize multiple punishments for involuntary manslaughter, motor vehicle homicide, and operating to endanger arising from the same act, as delineated in Commonwealth v. Jones, 382 Mass. 387, 394-395 (1981).  He also argued that the evidence was insufficient to sustain his involuntary manslaughter conviction and that his trial counsel was ineffective.
            On appeal, the Appeals Court reversed the convictions of motor vehicle homicide and operating to endanger, as the Legislature did not intend to impose multiple punishments based on the same act for those offenses where a defendant is also convicted of involuntary manslaughter.  Commonwealth v. Njuguna, 104 Mass. App. Ct. 148, 152-155, 160 (2024).  In doing so, the court relied on Jones, 382 Mass. at 394-395, reaffirming its continued precedential force.  Njuguna, supra.  The court also upheld the involuntary manslaughter conviction, rejecting the defendant's arguments that the evidence was insufficient and that his trial counsel was ineffective.  Id. at 155-160.
            We granted further appellate review and now reaffirm our holding in Jones as binding precedent, subject to the limitations set forth infra.  Accordingly, we affirm the defendant's convictions of involuntary manslaughter and operating an uninsured motor vehicle, but reverse the convictions of motor vehicle homicide and operating to endanger.  We further affirm the denial of the defendant's motion for a new trial.[1]
            Background.  1.  Facts.  We recite the facts that the judge could have found, viewing them in the light most favorable to the Commonwealth and drawing any reasonable inferences in its favor, reserving certain facts for later discussion.  See 480 McClellan LLC v. Assessors of Boston, 495 Mass. 333, 335 n.4 (2025); Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979).
            Around 11 A.M. on March 16, 2016, the defendant purchased four marijuana cigarettes from a dispensary in Brookline.  He then drove his black Nissan Maxima westbound on Interstate Route 90 (Massachusetts Turnpike).  The weather was sunny with clear visibility, and traffic was light.
            Several minutes before the defendant's vehicle crashed, witnesses observed a dark sedan being driven along the Massachusetts Turnpike.  One witness, Steven Janko, was driving about seventy to seventy-five miles per hour when he noticed a dark sedan "coming up pretty quickly" behind him.  He watched as the dark sedan abruptly changed lanes without signaling, attempting to pass a tractor trailer.  When unsuccessful, the dark sedan veered behind the tractor trailer, and then sharply moved to the left lane behind Janko.  The sedan followed Janko "pretty close[ly]" until the sedan overtook the tractor trailer, shifted to the center lane, sped past Janko and two other vehicles, and disappeared from Janko's vision.
            Observing the sedan's abrupt maneuvers, Janko remarked to his passengers that he had never "seen anybody driving this poorly."  One of his passengers, Eric Brattlof, also saw the vehicle, a black Nissan, "coming up really fast," speeding and weaving through lanes without signaling.
            A short time later, they encountered traffic that was "almost-stopped," and eventually passed a crash scene on the right side of the road.  Brattlof observed a State police cruiser in an adjacent field and a black Nissan with severe front-end damage facing the wrong direction.  He believed it was the same black Nissan that he had seen earlier; Janko suspected the same but was not certain.
            Inside the crashed cruiser was State police Trooper Thomas Clardy.  Prior to the crash, at approximately 12 P.M., the cruiser was parked with flashing lights in the breakdown lane.  Clardy had just pulled over another vehicle, which was stopped in front of his cruiser.  As Clardy remained seated inside the cruiser, the defendant's black Nissan suddenly veered across multiple lanes, without signaling, into the breakdown lane where it crashed into the rear of Clardy's cruiser.  The force of the impact sent the cruiser spinning off the road.  Clardy suffered fatal injuries, with the cause of death determined to be blunt force injuries to the head, neck, and torso.
            Several eyewitnesses saw the crash and attempted to assist before emergency personnel arrived.  One witness, Christopher Lindsay, was driving west in the middle lane at seventy-five miles per hour when he noticed a black Maxima or Altima approaching "really fast" from behind.  He also saw the State police cruiser parked in the breakdown lane with its lights flashing.  Lindsay watched as the black vehicle moved into the left lane, passing him at a speed that made him feel as if he "was stopped," and then cut to the right lane without signaling or braking.  Lindsay saw the driver sitting upright just before the black vehicle entered the breakdown lane and collided with the cruiser's rear corner.
            Another witness, Thomas Sorrentino, was also driving west in the middle lane at about seventy-five miles per hour when he saw a black Maxima suddenly "dart[]" from the left lane to the right lane "pretty quickly," without signaling or braking.  He noticed the police cruiser ahead, where a State police trooper appeared to be conducting a traffic stop.  After cutting across three lanes of traffic, the Maxima hit the shoulder of the road at an angle, straightened out, and continued to "rid[e] on the shoulder" at a "high rate of speed" before crashing into the parked cruiser without braking.
            A third witness, Michael Russell, was driving a tractor trailer when he saw a black vehicle rapidly approaching in the left lane.  Without signaling or braking, the black vehicle "veer[ed]" across three lanes and into the breakdown lane, striking the "back end or the rear quarter" of the parked police cruiser.
            First responders found the defendant unconscious.  He had suffered multiple injuries, including a lip laceration, an open wound to his right leg, broken wrists, and a concussion.  Before being airlifted to a hospital, he regained consciousness but appeared to be in an "altered" state, initially able to provide only his name.  At the hospital, he disclosed a history of asthma[2] and a prescription for medical marijuana, though he claimed that he had not used it in months.  He further stated that he had fallen asleep before the crash and that, while he denied having a history of seizures, he had previously experienced episodes of "blacking out."[3]  Toxicology tests showed tetrahydrocannabinol (THC)[4] in the defendant's system, but no alcohol.
            2.  The trial.  A bench trial was held in the Superior Court.  Fact witnesses, including Janko, Brattlof, Lindsay, Sorrentino, and Russell, testified about the events leading up to the crash.
            Both the Commonwealth and the defendant presented expert testimony on traffic collision reconstruction.  The Commonwealth's expert, Captain John Pinkham of the State police, concluded that the defendant's vehicle had no mechanical defects prior to the collision.  He estimated the Nissan's speed at impact to be at least eighty-one miles per hour.  In contrast, the defendant's expert, Steven Benanti, calculated the speed to be between sixty-four and eighty-one miles per hour.  Pinkham also observed that the Nissan's steering wheel was bent and locked into place -- an indication, along with the defendant's injured wrists, that the defendant was conscious at the time of the crash.[5]
            The defendant's central argument was that the crash resulted from a seizure.  The defendant's medical expert, Dr. Mark Neavyn, opined that the defendant experienced a "convulsive event," such as a seizure, "prior to the accident."  He cited medical indicators from the defendant's emergency room records, including an elevated prolactin level and a tongue laceration.  However, he acknowledged that a motor vehicle accident itself could trigger a seizure.[6]  Neavyn further testified that while the defendant had no self-reported history of seizures, this was not important given that Neavyn "see[s] patients with new onset seizure all the time."  Neavyn also opined that it was "unlikely" the defendant had fallen asleep prior to the crash -- as the defendant had initially claimed to doctors –- explaining that, had the defendant fallen asleep, his limbs would have gone limp and fallen off the steering wheel, rather than gripping the steering wheel tightly enough to bend it and break his wrists.
            The trial judge convicted the defendant of involuntary manslaughter, G. L. c. 265, § 13; misdemeanor motor vehicle homicide, G. L. c. 90, § 24G (b); operating to endanger, G. L. c. 90, § 24 (2) (a); and operating an uninsured motor vehicle, G. L. c. 90, § 34J, while acquitting him of the remaining charges.[7]  Specifically, the judge concluded that the Commonwealth had proven the defendant's conduct to be wanton or reckless:
"With either indifference to or in disregard of the grave risk of harm to others on the road, [the defendant] drove at excessive speeds, tailgated at excessive speed, passed vehicles, and attempted to pass vehicles in [an] extremely dangerous manner by passing too closely and weaving in and out.  He continued to speed and then pass other vehicles with conscious disregard to obvious hazards, including Trooper Clardy's [c]ruiser with his flashing blue lights.  Without slowing down or signaling, [the defendant] recklessly crossed three lanes of traffic at 80 miles per hour, all the way into the breakdown lane and at 80 miles per hour crashed into the back of the [c]ruiser.  I find, therefore, that he operated his vehicle in a reckless manner, and therefore, also in a negligent way."
While the judge acknowledged Neavyn's testimony suggesting the possibility of a "convulsive episode," the judge concluded that "the totality of the circumstances in this case does not support his opinion that a convulsive episode occurred prior to the crash" (emphasis added).
            The defendant received a sentence of from five to seven years in State prison for the involuntary manslaughter conviction, with lesser concurrent sentences on the remaining convictions.
            3.  Motion for a new trial.  Following his convictions, the defendant moved for a new trial, arguing, among other things, that his trial counsel had been ineffective for failing to investigate Brattlof.  Specifically, he contended that a proper investigation would have uncovered evidence of Brattlof's pro-police bias (principally, a photograph posted on social media), which could have been used to impeach him.
            The motion judge, who was also the trial judge, held an evidentiary hearing where Brattlof and trial counsel testified.  The judge found that Brattlof learned from Janko that the defendant's crash had resulted in the death of a State police trooper.  Around the time of Trooper Clardy's funeral, Brattlof posted on social media a photograph depicting a State police shield draped with a black band.  While he intended the post as a sign of respect for Clardy and law enforcement, Brattlof expressed sympathy for all involved, stating, "[W]hen you have an accident of this type of magnitude, everybody loses, both sets of people that are involved and their families."
            After the hearing, the judge issued a decision denying the motion for a new trial.  The judge credited Brattlof's testimony and found no evidence of bias against the defendant or in favor of the State police.  The judge further concluded that trial counsel's performance neither fell measurably below the standard expected from an ordinary fallible lawyer nor deprived the defendant of a substantial ground of defense.  In reaching this conclusion, the judge noted that trial counsel "ably cross examined Brattlof on the inconsistencies between his statements to the police and his trial testimony."
            4.  The appeal.  In the defendant's consolidated appeal from both the convictions and the denial of his new trial motion, the Appeals Court upheld the judgments of conviction of involuntary manslaughter and operating an uninsured motor vehicle, as well as the denial of his new trial motion.  See Njuguna, 104 Mass. App. Ct. at 160.  However, as to the motor vehicle homicide and operating to endanger convictions, the Appeals Court reversed the judgments, set aside the findings, and entered judgments for the defendant.  Id.  We granted the defendant's and the Commonwealth's applications for further appellate review.
            Discussion.  1.  Duplicative convictions.  On appeal, the defendant argues that the Legislature did not authorize duplicative convictions of involuntary manslaughter, motor vehicle homicide, and operating to endanger based on the same act, as held in Jones, 382 Mass. at 394-395.  We agree.
            Under Morey v. Commonwealth, 108 Mass. 433, 434 (1871), Massachusetts follows the traditional rule that "a defendant may properly be punished for two crimes arising out of the same course of conduct provided that each crime requires proof of an element that the other does not."  Commonwealth v. Valliere, 437 Mass. 366, 371 (2002).  When this elements-based criterion is met, convictions for both offenses are generally deemed authorized and not duplicative.  Commonwealth v. Vick, 454 Mass. 418, 431 (2009), quoting Jones, 382 Mass. at 393.  Conversely, when one crime's elements are entirely a subset of the elements of another, the lesser offense is typically subsumed, barring cumulative punishment.  See Commonwealth v. Selavka, 469 Mass. 502, 510 (2014); Commonwealth v. Porro, 458 Mass. 526, 531 (2010).
            In rare instances, this court has deviated from the Morey elements-based test, concluding that an offense is a lesser included offense despite its elements not entirely overlapping with the greater offense.  See, e.g., Porro, 458 Mass. at 534 (threatened battery theory of assault is lesser included offense of intentional assault and battery); Commonwealth v. Walker, 426 Mass. 301, 305-306 (1997) (indecent assault and battery of child under fourteen is lesser included offense of forcible rape of child under sixteen).  These few departures have been justified by clear legislative intent that the elements-based approach of the Morey test should not govern our analysis.[8]
            One such rare departure can be found in Jones, 382 Mass. 392-393, which addressed the offenses at issue here.  Applying the Morey test, the Jones court recognized that neither negligent motor vehicle homicide nor operating to endanger is a lesser included offense of involuntary manslaughter, as the former requires proof of operation of a motor vehicle on a public way or in a public area, while manslaughter requires proof of wanton or reckless conduct.  Id. at 393-394.  Nonetheless, the court held that a defendant convicted of involuntary manslaughter cannot also be punished for either negligent motor vehicle homicide or operating to endanger.  Id. at 394.  The court's conclusion was driven by the legislative history of the negligent motor vehicle homicide statute, G. L. c. 90, § 24G, which established the offense as a "middle ground" between the felony of involuntary manslaughter and the misdemeanor of operating to endanger.  Id. at 390-391.  The court held that punishing a defendant for both lesser offenses - negligent motor vehicle homicide and operating to endanger -- when the defendant has already been convicted of involuntary manslaughter would contradict the Legislature's intent, reasoning:
"There is no indication that, by enacting the vehicular homicide statute as a middle ground between operating to endanger and [involuntary] manslaughter, the Legislature intended to punish a defendant for the two less serious motor vehicle offenses if he is already being punished under the most serious offense of [involuntary] manslaughter."
Id. at 394.
            The Commonwealth contends that Jones improperly employed a conduct-based analysis of the facts of that particular case rather than applying the elements-based Morey test.  This court has generally rejected conduct-based reasoning, emphasizing the Legislature's prerogative to define crimes and punishments.  See Vick, 454 Mass. at 433-434.  See generally Commonwealth v. Niels N., 73 Mass. App. Ct. 689, 709–710 (2009) (Cypher, J., dissenting in part) (exploring historical development of this area of law).
            Admittedly, there is language in Jones that suggests a conduct-based analysis.[9]  Yet, in subsequent years, Jones has been cited with approval.  See Commonwealth v. Suero, 465 Mass. 215, 221 (2013).  This has led to confusion about the continued validity of Jones and the proper framework for analyzing whether convictions are duplicative.  Compare Njuguna, 104 Mass. App. Ct. at 154-155 (suggesting Jones does not support conduct-based test), with Commonwealth v. Buckley, 76 Mass. App. Ct. 123, 125-126 (2010) (suggesting Jones followed repudiated "conduct-based approach").
            To clarify, the analysis of duplicative convictions is a matter of statutory construction, turning on whether the Legislature intended to authorize multiple punishments.  See Commonwealth v. Crocker, 384 Mass. 353, 360 (1981) ("Once the Legislature has acted by defining a crime and its punishment, the court's role in this area is limited to implementing the legislative intent behind the statute").  Statutory text is the primary guide.  Commonwealth v. Perez Narvaez, 490 Mass. 807, 809 (2022).  If the Legislature explicitly authorizes multiple punishments under two statutes, courts must enforce that directive.  Commonwealth v. Alvarez, 413 Mass. 224, 232 (1992).  Where the statutory text is silent, Morey's elements-based test serves as the default interpretive tool, creating a presumption of legislative intent.  See Crocker, supra ("The assumption underlying the Morey rule . . . is that the Legislature ordinarily does not intend to punish the same offense under two different statutes" [quotation and citation omitted]).
            Nevertheless, as Jones illustrates, contrary evidence of legislative intent can, in rare cases, indicate that the Morey test is inapt to capture the legislative intent.  See Crocker, 384 Mass. at 360 ("where expressions of legislative intent indicate that double punishment should not be imposed, courts should implement that intent even though the offenses are distinct under the Morey test").  Again, such departures are warranted only in "rare circumstances" where legislative intent is unmistakenly clear.  Porro, 458 Mass. at 532.  In Porro, for example, this court relied on statutory structure and the legislatively authorized limit on sentencing to conclude that the threatened battery theory of assault is a lesser included offense of intentional assault and battery.  Id. at 534-535.[10]
            Similarly, in Jones, 382 Mass. at 390, this court considered legislative history, particularly a 1976 memorandum to the General Court's Judiciary Committee concerning a bill for the motor vehicle homicide statute, G. L. c. 90, § 24G.[11]  The memorandum noted that prosecutors hesitated to charge manslaughter in cases involving motor vehicle fatalities due to jurors' reluctance to convict fellow drivers of such a serious charge, but found existing penalties inadequate for this crime.  Jones, supra.  See Commonwealth v. Carlson, 447 Mass. 79, 85 (2006).  This historical context demonstrated a clear legislative intent to create a tiered structure of motor vehicle offenses, preventing cumulative punishments for lesser offenses when manslaughter is charged, which necessitated a departure from the Morey elements-based test.  See Jones, supra at 390-391.
            By contrast, our decision in Vick did not involve motor vehicle homicide.[12]  Instead, our analysis was driven by the Morey test, there being no legislative history akin to that at issue in Jones.  Thus, while Jones remains valid authority, its holding is limited to motor vehicle offenses in view of the unique legislative history of those statutes; it does not establish a broader precedent for departing from the Morey elements-based test in other areas of law.  See Jones, 382 Mass. at 390-391.  Rather, Jones represented the exceptional case where the unmistakable legislative intent justified a departure from Morey.  And we decline, at this late date, to revisit that conclusion.  See Kimble v. Marvel Entertainment, LLC, 576 U.S. 446, 456 (2015) ("[S]tare decisis carries enhanced force when a decision . . . interprets a statute.  Then, unlike in a constitutional case, critics of our ruling can take their objections across the street, and [the Legislature] can correct any mistake it sees").
            Accordingly, we reverse the defendant's convictions of motor vehicle homicide and operating to endanger as duplicative of his conviction of involuntary manslaughter.
            2.  Sufficiency of the evidence.  Next, the defendant argues that the trial evidence was insufficient to establish, for purposes of his involuntary manslaughter conviction, that he engaged in wanton or reckless conduct.  This court assesses the sufficiency of the evidence by determining "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (citation omitted).  Commonwealth v. Strong, 495 Mass. 119, 126 (2024).
            Involuntary manslaughter arises where death is caused by wanton or reckless conduct -- that is, "intentional conduct that create[s] a high degree of likelihood that substantial harm will result to another person" (citation omitted).  Commonwealth v. O'Brien, 494 Mass. 288, 297 (2024).  Notably, wanton or reckless conduct does not require an intent to cause the specific harm, only an intent to engage in the wanton or reckless conduct itself.  Commonwealth v. Hardy, 482 Mass. 416, 421 (2019).  This standard may be satisfied either subjectively, based on the defendant's specific knowledge, or objectively, based on what a reasonable person should have known in the circumstances.  Commonwealth v. Pugh, 462 Mass. 482, 496-497 (2012).  Here, there was overwhelming evidence for a rational trier of fact to find, beyond a reasonable doubt, that the defendant intentionally drove in a wanton or reckless manner.
            Just minutes before the crash, eyewitnesses Janko and Brattlof observed a black sedan -- reasonably inferred to be the defendant's vehicle[13] -- tailgating Janko, traveling at excessive speeds, and weaving through traffic without signaling.  Immediately before the crash, Lindsay, Sorrentino, and Russell all saw the defendant's vehicle speeding.  Both Lindsay and Sorrentino also observed the defendant weaving through traffic without signaling or braking, entering the breakdown lane, and crashing into the cruiser.  Sorrentino further noted that the defendant's vehicle "corrected" itself after entering the breakdown lane, undermining the defense's assertion that he suffered a medical episode prior to impact.
            Pinkham's observations and calculations corroborated the eyewitness accounts, as he determined that the defendant's vehicle was traveling at a minimum of eighty-one miles per hour at the time of impact.  Pinkham also opined that the absence of any pre-impact brake marks around the site of the collision indicated that the defendant made no attempt to stop.  This considerable, cumulative evidence clearly supports the conclusion that the defendant intentionally engaged in conduct creating a high likelihood of substantial harm to others.  See Commonwealth v. DeSimone, 349 Mass. 770, 770-771 (1965) (holding that weaving through traffic, tailgating, and hazardous passing may constitute wanton or reckless conduct sufficient for manslaughter conviction).
            The defendant attempts to compare this case to Hardy, 482 Mass. at 424, where this court vacated an involuntary manslaughter conviction after concluding that the driver's momentary inattentiveness -- resulting in her failure to brake and causing a fatal crash -- amounted to negligence rather than wantonness or recklessness.  See id. at 426 ("Where negligence may result from inadvertence, incompetence, unskillfulness, or failure to take [adequate] precautions, recklessness requires a conscious choice of a course of action . . . with knowledge of the serious dangers to others involved" [quotations and citation omitted]).  We disagree; this case is readily distinguishable from Hardy.
            Here, the evidence supports the trial judge's finding that the defendant intentionally drove in a dangerous manner over an extended period of several minutes before the crash.  Eyewitness testimony established that during this time, the defendant drove at excessive speeds, tailgated, and passed or attempted to pass vehicles by weaving through traffic without signaling.  The judge also found that the defendant crossed three lanes of traffic "[w]ithout slowing down or signaling" before colliding with the stopped cruiser.
            As the fact finder, the judge was entitled to credit the Commonwealth's witnesses and reject the defendant's medical expert testimony suggesting that the defendant suffered a medical episode just before the crash.  See Commonwealth v. Ianello, 401 Mass. 197, 202 (1987) (witness credibility is exclusively determined by fact finder).  Viewed in the light most favorable to the Commonwealth, the evidence sufficiently established that the defendant engaged in wanton or reckless conduct, supporting the defendant's conviction of involuntary manslaughter.  See Strong, 495 Mass. at 126.
            3.  Ineffective assistance of counsel.  Lastly, the defendant contends that the judge erred in denying his motion for a new trial based on ineffective assistance of counsel.  As he argued below, the defendant claims that his trial counsel failed to investigate Brattlof's social media post adequately and that a proper investigation would have provided grounds to impeach Brattlof for bias.  Specifically, the defendant maintains that Brattlof's post demonstrated sympathy for the victim, which could have been used to undermine Brattlof's credibility and to explain why his recollection of the defendant and his vehicle "improved over time."[14]
            The decision whether to grant a new trial rests within the sound discretion of the motion judge.  Commonwealth v. Mcfarlane, 493 Mass. 385, 390 (2024).  We afford special deference to the judge's factual findings and ultimate decision, particularly where, as here, the motion judge also presided over the trial.  Commonwealth v. Moore, 489 Mass. 735, 744 (2022).  A claim of ineffective assistance of counsel requires the defendant to establish that counsel's behavior fell measurably below that of an ordinary fallible lawyer and that this deficiency "likely deprived the defendant of an otherwise available, substantial ground of defence."  Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).
            The duty to investigate is fundamental to effective representation, as strategic decisions are only adequate if informed by sufficient knowledge of available options.  Commonwealth v. Long, 476 Mass. 526, 532 (2017).  When assessing an ineffective assistance claim based on counsel's failure to investigate, we evaluate the omission's reasonableness in context, applying "a heavy measure of deference to counsel's judgments."  Commonwealth v. Tavares, 491 Mass. 362, 366 (2023), quoting Strickland v. Washington, 466 U.S. 668, 691 (1984).  While not required to pursue every possible lead, trial counsel must "make reasonable investigations" or reasonably decide that certain investigations are unnecessary.  Tavares, supra, quoting Strickland, supra.
            Even assuming trial counsel erred by not investigating Brattlof, the information such an investigation would have yielded was limited to impeachment evidence.  See Commonwealth v. Watt, 484 Mass. 742, 763 (2020), S.C., 493 Mass. 322 (2024).  Generally, "failure to impeach a witness does not prejudice the defendant or constitute ineffective assistance," Commonwealth v. Bart B., 424 Mass. 911, 916 (1997), unless it "deprives [the] defendant of a substantial defense," Commonwealth v. Lacrosse, 494 Mass. 475, 491 (2024).  A defense is "substantial" when the verdict would be seriously in doubt had the defense been presented.  Commonwealth v. Millien, 474 Mass. 417, 432 (2016).
            The judge did not abuse her discretion in concluding that the defendant was not deprived of a substantial defense.  As the judge noted, trial counsel had already conducted extensive cross-examination of Brattlof, highlighting inconsistencies in his statements to the police regarding both the vehicle and its driver.  See Commonwealth v. Fisher, 433 Mass. 340, 357 (2001) (no ineffective assistance where witness "was subjected to extensive impeachment," even if counsel did not "pursue additional avenues of impeachment").  Furthermore, even discounting Brattlof's testimony, "[t]he weight of the evidence against the defendant was overwhelming."  Commonwealth v. Wall, 469 Mass. 652, 665 (2014).  Numerous eyewitnesses described the defendant's dangerous and erratic driving, including Janko, who observed the defendant contemporaneously with Brattlof, as well as Lindsay, Sorrentino, and Russell, who all witnessed the crash itself.  Finally, the judge -- who also served as the trial fact finder -- found Brattlof credible and determined that he was not biased.  See Fisher, supra (absent "some obviously powerful form of impeachment," it is speculative to conclude that different impeachment approach would have altered fact finder's conclusion).  See also Commonwealth v. Jones-Pannell, 472 Mass. 429, 438 (2015) (appellate courts defer to motion judge's credibility determinations).
            Conclusion.  For these reasons, we affirm the judgments as to involuntary manslaughter and operating an uninsured motor vehicle, and we affirm the order denying the defendant's motion for a new trial.  However, we reverse the judgments as to the motor vehicle homicide and operating to endanger convictions, set aside those findings, and direct that judgment enter for the defendant on those charges.
So ordered.
 
footnotes

 
            [1] We acknowledge the amicus brief submitted by Mfouad A. Faris.
            [2] Two inhalers were found in the defendant's vehicle, one of which was empty.  At trial, the defendant's expert testified that asthma-related low oxygen can trigger seizures.
            [3] The defendant's medical records prior to the crash showed no history of losing consciousness or seizures.
            [4] THC is "the primary psychoactive substance in marijuana . . . [and] is known to have an impact on several functions of the brain that are relevant to driving ability, including the capacity to divide one's attention and focus on several things at the same time, balance, and the speed of processing information."  Commonwealth v. Gerhardt, 477 Mass. 775, 781 (2017).
            [5] The defendant's medical expert reiterated this opinion, stating that both of the defendant's wrists being broken and the steering wheel being bent indicate that "there was a firm grip on the steering wheel at the time of the collision."  This implies that the defendant did not fall asleep prior to the crash, because if he had, his limbs would have gone "limp" and "fall[en]."
            [6] Similarly, a forensic psychiatrist for the Commonwealth noted that elevated prolactin levels may result from various conditions, including seizures, trauma, or kidney issues.  The psychiatrist also noted that while the defendant had not been diagnosed with a seizure, he had been diagnosed with a concussion, which can result in cognitive issues such as confusion.  Further, following the crash, the defendant was never treated for seizures or prescribed anti-seizure medication.
            [7] The defendant was acquitted of manslaughter by means of operating a motor vehicle while under the influence of drugs, G. L. c. 265, § 13 1/2, and motor vehicle homicide by means of operating while under the influence of drugs, G. L. c. 90, § 24G (a).  Although the judge determined that the defendant had smoked part of a marijuana cigarette that was in his vehicle before the crash, the Commonwealth presented no expert testimony proving that the defendant's ability to drive was impaired.  The judge also credited Neavyn's testimony that an elevated THC level in a person's blood does not necessarily indicate impairment of ability to drive.
            [8] This court has also departed from the Morey test when the Legislature has expressly authorized punishments for both greater and lesser included offenses.  See, e.g., Commonwealth v. Rivas, 466 Mass. 184, 189 n.7 (2013) (although, under Morey test, unlawful possession of firearm, G. L. c.  269, § 10 [a], is lesser included offense of unlawful possession of loaded firearm, G. L. c.  269, § 10 [n], text of latter statute clearly demonstrates legislative intent to impose separate punishments for both offenses); Commonwealth v. Alvarez, 413 Mass. 224, 231-232 (1992), abrogated on other grounds by Commonwealth v. Kelly, 484 Mass. 53 (2020) (Legislature expressly authorized consecutive sentences for violating "school zone" statute and lesser included offense of possession of cocaine with intent to distribute).
            [9] The court in Jones framed its discussion with language suggesting a conduct-based approach.  Specifically, it stated, "Although we decline to hold that vehicular homicide is a lesser-included crime of manslaughter, we nonetheless conclude that in the present situation, which in fact did involve operation of a motor vehicle on a public way, the two offenses are sufficiently closely related so as to preclude punishment on both" (emphasis added).  Jones, 382 Mass. at 394.  However, the court's actual analysis appropriately focused on the crimes in the abstract and the legislative intent behind them.  See id.  To the extent that Jones incorporates conduct-based reasoning, that is incorrect.  Nevertheless, disregarding such inappropriate language, the court's ultimate holding remains sound.  As we discuss infra, Jones also applied a correct and necessary analysis of legislative intent.
            [10] "Our decision that a defendant charged with assault and battery faces a single conviction under either theory of assault and battery or either theory of assault is consistent with the Legislature's statutory grouping of these common-law offenses."  Porro, 458 Mass. at 534.  A contrary conclusion would allow the Commonwealth to "secur[e] a greater penalty than that established by the Legislature."  Id. at 535.
            [11] That memorandum is not the sole evidence of legislative intent behind G. L. c. 90, § 24G.  Since Jones, the Legislature has repeatedly amended the statute over several decades without expressly authorizing multiple punishments for involuntary manslaughter, motor vehicle homicide, or operating to endanger.  See St. 1982, c. 373, § 9; St. 1982, c. 376, §§ 1, 2; St. 1986, c. 620, §§ 15, 16; St. 2003, c. 28, §§ 21, 22; St. 2005, c. 122, § 16; St. 2018, c. 69, § 37; St. 2018, c. 273, § 19.  Because "[t]he Legislature is presumed to be aware of the prior state of the law as explicated by the decisions of this court" (citation omitted), Commonwealth v. Montarvo, 486 Mass. 535, 541 (2020), its prolonged inaction suggests approval of this court's statutory interpretation in Jones, Commonwealth v. Bohigian, 486 Mass. 209, 215-216 (2020).
            [12] In Vick, 454 Mass. at 419, the defendant contended that his conviction of armed assault with intent to murder was duplicative of his conviction of assault and battery by means of a dangerous weapon causing serious bodily injury.  Employing the Morey elements-based test, and without identifying any clear legislative intent to the contrary, this court concluded that the convictions were not duplicative.  Id. at 430-433.
            [13] The black sedan can be linked to the defendant based on the witnesses' descriptions, the timing and location of their observations relative to the crash, and their belief that the vehicle involved in the crash was the same sedan that they had seen earlier.
            [14] The defendant highlights apparent inconsistencies in Brattlof's testimony regarding the vehicle and its driver.  Initially, Brattlof described the vehicle to the State police as an "older model black car," but later at trial identified it as a "Nissan."  Similarly, his description of the driver changed; he first told the State police that the driver had "short" hair, but later testified that the driver's hair was "shoulder length" and that it was "long."  Brattlof explained this discrepancy at the hearing on the motion for a new trial by testifying that he considers "shoulder length hair" as "short" on a woman, but "medium" length on a man.